[PUBLISH]


IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
October 20, 2005
THOMAS K. KAHN
CLERK

_____

No. 03-14400

_____

D. C. Docket No. 99-06153-CR-KMM



UNITED STATES OF AMERICA,


                                                    Plaintiff-Appellee,


                          versus



FABIO OCHOA-VASQUEZ,
a.k.a. Julio,
a.k.a. Pepe,


                                                    Defendant-Appellant.




_____

No. 04-10718

_____

D. C. Docket No. 99-00196-CR-PAS

UNITED STATES OF AMERICA,

                                                          Plaintiff-Appellee,

                              versus

JUAN NICHOLAS BERGONZOLI,

                                                          Defendant,

FABIO OCHOA-VASQUEZ,

                                                          Interested Party-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____
(October 20, 2005)

Before BARKETT and HULL, Circuit Judges, and EDENFIELD[*], District Judge.

EDENFIELD, District Judge:

This opinion consolidates and decides the appeals of Fabio Ochoa-Vasquez

("Ochoa") in U.S. v. Ochoa-Vasquez, Case Number 03-14400, in which Ochoa is a

criminal defendant, and U.S. v. Bergonzoli, Case Number 04-10718, in which Ochoa

_____

[*] Honorable B. Avant Edenfield, United States District Judge for the Southern District of Georgia, sitting by designation.

2

is an intervenor. In <u>Ochoa-Vasquez</u>, Ochoa appeals his conviction and sentence for drug trafficking violations, two orders denying him access to judicial proceedings and records, and the use of a secret docketing system. In <u>Bergonzoli</u>, Ochoa appeals the district court's striking of his motion to unseal court proceedings and records, and its refusal to disqualify defendant Nicolás Bergonzoli's counsel, Joaquin Perez, prior to that ruling.

## I. BACKGROUND

In the 1980s Ochoa was a high-ranking member of the Medellín drug cartel based out of Medellín, Colombia. However, pursuant to a leniency program, he surrendered to Colombian authorities in the early 1990s, served six years in a Colombian prison, and was released in 1997. Two years later the United States indicted Ochoa for his part in a post-1997 narcotics operation involving trafficker Alejandro Bernal.

The United States Drug Enforcement Agency (DEA) targeted Bernal in "Operation Millennium," a large drug-trafficking investigation conducted jointly with Colombian law enforcement agencies in 1999-2000. Operation Millennium agents acquired audio surveillance tapes from a wiretap of Bernal's Bogotá office revealing his coordination of drug-trafficking operations and the participation of various other defendants. The tapes reveal Ochoa's involvement. Accordingly, Colombian

3

authorities arrested Ochoa based on a U.S. warrant in October 1999, and he was extradited to this country in 2001.

At trial, the government presented substantial evidence of Ochoa's guilt, including the testimony of Ochoa's co-conspirators, Bernal and Hector Londoño. They testified that Ochoa entered the conspiracy by assuming a narcotics-related debt that Bernal owed to another drug trafficker, Nicolás Bergonzoli. Following his earlier incarceration in Colombia, Ochoa was cash-poor and land-rich. He thus paid Bernal's debt to Bergonzoli with real estate in exchange for Bernal's promise to repay Ochoa with cash from future drug-trafficking operations. To secure his investment, Ochoa actively advised Bernal and otherwise facilitated Bernal's trafficking activities. Based on extensive evidence, the jury convicted Ochoa of conspiracy to possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and conspiracy to import five kilograms or more of cocaine into the U.S., in violation of 21 U.S.C. §§ 952 and 963.

Ochoa sought to admit evidence at trial about an illegal scheme called the "Rehabilitation Program of Narcotics Traffickers" (the "Program").[1] The Program was a scheme in which DEA informant Baruch Vega solicited drug traffickers to

---

[1]This is a translation of the Spanish name, "Programa de Resocialización de Narcotraficantes," allegedly coined by its organizer, Baruch Vega.

4

surrender to the U.S. government by promising to arrange phony cooperation deals. The traffickers were told that they could join the Program by paying large sums of money and surrendering drugs to U.S. authorities through phony drug busts. The confiscated drugs would then be attributed to other traffickers. The Program's recruits were told that they would receive credit for their "cooperation," enabling them to obtain favorable plea bargains from U.S. prosecutors. It remains unclear whether any of these promises were ever carried out,[2] and the prosecutors in Ochoa's case disavow any knowledge of Vega's scheme prior to Ochoa's indictment.

After his arrest, while awaiting extradition from Colombia, Ochoa was solicited to join the Program for $30 million in cash and "confiscated" narcotics. Several meetings took place between Ochoa's brother Jorge, alleged Program participant Bergonzoli, and Bergonzoli's attorney, Joaquin Perez. Bergonzoli encouraged Ochoa to join the Program and spoke openly of his participation in staged drug transactions and the resulting leniency he received. Ochoa claims that during these meetings he retained Perez as counsel to assist him in negotiating a deal with U.S. authorities. However, Ochoa ultimately refused to join the Program, and in February 2000, he

---

[2]Vega was later indicted for money laundering and obstruction of justice, but the charges were dismissed. According to the government, Vega maintains that the Program was simply a fabrication used to induce drug traffickers to surrender. D.E. 1071 at 6. He explained that the "corruption pitch" was a useful lie because Colombian drug traffickers viewed bribery as a solution to law enforcement problems. Id.

purportedly fired Perez. Meanwhile, Ochoa's family had secretly recorded the meetings and turned the tapes over to the U.S. Attorney's Office. Ochoa alleges that the tapes, plus pressure from U.S. Customs, sparked an internal investigation of Vega and ultimately resulted in the Program's termination.

Prior to his trial, Ochoa sought to obtain various documents relating to the participation of Bergonzoli and others in the Program. Apparently, the government and the co-defendants had agreed to seal many documents as the cases progressed. Ochoa thus moved to unseal documents relevant to co-defendants in his own case, including motions, orders, hearing transcripts, and pleadings. He also moved as an intervenor to unseal documents in a separate criminal case against Bergonzoli. The district judges in those cases eventually unsealed the majority of the documents Ochoa sought. However, a few Bergonzoli documents, including plea colloquies, sentencing memoranda, downward-departure motions, and sentencing hearings, still remain sealed and are the subject of this appeal.

## A.  Trial and Issues on Appeal in Ochoa-Vasquez

Before trial, Ochoa moved to dismiss the indictment, suppress evidence from all witnesses involved in the Program, and disqualify Perez from representing Bergonzoli, who Ochoa alleged was a potential witness against him. He claimed violations of due process in that the Program constituted outrageous government

6

conduct and because his prosecution was a vindictive and retaliatory response to his blowing the whistle on the Program.

The district court denied Ochoa's motions, finding that "Defendant [had] failed to demonstrate any nexus between Vega's misconduct and the indictment and prosecution of Defendant." It subsequently granted the government's motion in limine to prevent him from making reference to the Program at trial. The judge also granted the government's motion for an "innominate[3] and partially sequestered jury" because of security concerns.

Ochoa now appeals his conviction and sentence, arguing that the district court erroneously:

(1) allowed the government to constructively amend the indictment or materially vary its proof at trial from the allegations in the indictment;

(2) refused to disqualify Bergonzoli's attorney;

(3) denied Ochoa's pre- and post-trial motions without an evidentiary hearing;

---

[3]The government and district judge described the jury as "innominate," not "anonymous." We have previously noted that the word "anonymous" may connote a "clandestine, forbidden, and obscure" jury panel. U.S. v. Carpa, 271 F.3d 962, 963 n.1 (11th Cir. 2001). Thus, where only the jurors' names, addresses, and places of work are concealed, the courts in this Circuit have used the term innominate rather than anonymous to avoid the negative connotation. Id.; see also U.S. v. Bowman, 302 F.3d 1228, 1236 n.1 (11th Cir. 2002). However, every other federal appellate court to address the issue uses the word "anonymous," so for the sake of consistency, we do so here. District courts may continue to use the word "innominate" when addressing jurors.

(4) excluded evidence about government witnesses' participation in the Program;[4]

(5) empaneled an anonymous jury; denied his request for additional voir dire and jury questionnaires; refused to permit an investigation of potential juror misconduct; and permitted the prosecution to strike jurors in a racially discriminatory manner;

(6) denied his motion to dismiss for improper venue; and

---

[4]Ochoa's theory was that Bernal and Londoño, who testified against him, had attempted to buy their way into the Program, that the Program had been destroyed by Ochoa's whistle-blowing, and that because Bernal's and Londoño's potential phony cooperation deals were thus ruined by Ochoa, they were motivated to testify falsely against him. However, the district court excluded evidence about the Program from trial, and therefore Ochoa could not introduce such evidence to demonstrate their bias. "In considering evidence [proffered] to show bias, the judge must determine whether it is probative of bias and, if so, whether its probative value outweighs the risks of prejudice attending its admission." U.S. v. Diecidue, 603 F.2d 535, 550 (11th Cir. 1979); see also F.R.Evid. 403. "The extent of proof of bias is a matter reserved to the discretion of the trial judge and the judgment will be disturbed on review only where an abuse of that discretion is shown." Diecidue, 603 F.2d at 550.

The district court did not abuse its discretion in excluding this evidence as having little probative value and serving simply to distract the jury from the true issues in the case. First, it did permit Ochoa to extensively cross-examine Bernal and Londoño, even concerning their families' contacts with Vega. Moreover, it allowed him to question them concerning any potential benefits they would receive from the government for testifying against him. Thus, Ochoa was permitted to confront the witnesses against him and expose many potential sources of bias.

Second, in order to raise inferences of bias from Ochoa's whistle-blowing, he would have had to prove at trial (1) the existence of the Program, (2) that Bernal and Londoño were each attempting to join it, and (3) that Ochoa's actions against the Program severed their hopes for a favorable plea bargain. This would have consumed a significant portion of the trial, as Ochoa would have to call numerous witnesses and presumably supply reams of contested evidence. That spectacle also would have diverted the jury's attention to evidence that neither proved nor disproved Ochoa's guilt. And it would have prejudiced the prosecution by exposing the jury to evidence of alleged "government" (DEA) misconduct that was unrelated to Ochoa's indictment or the government's prosecution of his case. Hence, we cannot say that the district court abused its discretion in excluding this evidence because the risk of prejudice attending its admission and the risk of distracting the jury from the true issues in the case substantially exceeded its probative value.

8

(7) tried and sentenced him for offenses other than those for which he was extradited.

Ochoa also alleges, as a member of the public, violations of his First Amendment right of access to judicial proceedings and records. He asserts that the use of a secret docket and improperly sealed files in, inter alia, Ochoa-Vasquez and Bergonzoli, violated his First Amendment rights and his "trial rights" under the Fifth and Sixth Amendments.

## B. Ochoa's Intervention and Appeal in Bergonzoli

While attempting to unseal files, Ochoa sought information about the fate of Bergonzoli, who sold Bernal's drug debt to Ochoa and later attempted to recruit Ochoa into the Program. He argued that he needed information concerning Bergonzoli's participation in the Program because Bergonzoli was a potential trial witness.[5] He had discovered the Bergonzoli case through a record in the U.S. District Court for the District of Connecticut, where the case was first filed, containing the post-transfer case number assigned by the Southern District of Florida. After it was transferred into the Southern District of Florida on 3/23/99, every proceeding and

---

[5]Though Bergonzoli arguably was a potential witness in Ochoa's trial because he participated in the three-way land swap detailed supra, the government never called him to testify. Moreover, Ochoa does not explain the relationship between Bergonzoli's potential testimony on that issue and Bergonzoli's participation in the Program. Ochoa sought to discover only the latter information in the sealed files. D.E. 985 at 4.

9

record was filed under seal and the case name, case number, and docket sheet were also undisclosed.

Prior to trial, Ochoa moved the Ochoa-Vasquez district judge for access to the proceedings and records sealed by the Bergonzoli district judge. The government responded that the Ochoa-Vasquez district judge did not have authority to unseal records in a case assigned to a different judge. The judge denied Ochoa's motion. After the prosecution rested, Ochoa renewed his motion before the Ochoa-Vasquez district judge, citing a need to determine whether to call Bergonzoli as a defense witness. The Ochoa-Vasquez district judge, doubting his authority to overturn another judge's sealing order, instructed Ochoa to intervene in the Bergonzoli case to obtain relief.

Ochoa thus intervened in the Bergonzoli case, moving to unseal the entire case file. But the judge presiding over that case was unavailable, so Ochoa's motion was randomly reassigned to the judge presiding over Ochoa's own case. Acting in the Bergonzoli case, then, he held an in camera hearing and entered a 5/23/03 order unsealing the case name, case number, docket sheet, and most of the individual files.[6] Ochoa did not appeal that order.

---

[6]Ochoa unsuccessfully sought, among other things, a continuance of his criminal trial to further investigate matters exposed by the newly unsealed documents.

Instead, he filed a renewed motion on 7/3/03 in the Bergonzoli case, again claiming that "the entire case file should be unsealed" and "the court should disqualify attorney Perez from continuing to represent Bergonzoli." The Bergonzoli district judge concluded that Ochoa's renewed motion violated a Local Rule governing reposted motions and that it reasserted issues previously argued in Ochoa's own case. So, she struck the motion and its related papers, including a 1/29/04 supplemental motion filed by Ochoa. Ochoa now appeals that order, arguing that:

> (1) his 1/29/04 "Supplemental Motion to Unseal New Sealed Matters," which the district court denied as a related paper, did not duplicate previously litigated matters;
>
> (2) the order was issued in violation of his First Amendment and common-law rights of access to judicial proceedings and records;
>
> (3) the government was judicially estopped from opposing his motion; and
>
> (4) the district court again erred in refusing to disqualify Bergonzoli's attorney, Perez, before ruling on Ochoa's motion.

We consolidated this Bergonzoli appeal with Ochoa's appeal in his own case (Ochoa-Vasquez) and now consider them together.

## II. FIRST AMENDMENT AND RELATED CLAIMS

### A. Denial of Access Order in <u>Bergonzoli</u>

As an intervenor in the <u>Bergonzoli</u> case, Ochoa argues that the district court

erred when it struck and refused to consider his renewed motion to unseal

documents.[7] The <u>Bergonzoli</u> judge struck this motion because it violated S.D. FLA.

---

[7]The government challenges our jurisdiction to hear Ochoa's appeal from this order. 28 U.S.C. § 1291 grants us jurisdiction over appeals "from all final decisions of the district courts of the United States." We also have jurisdiction to hear appeals from non-final decisions that fall within the "collateral order" doctrine established by the Supreme Court in <u>Cohen v. Beneficial Industrial Loan Corp.</u>, 337 U.S. 541 (1949). Under the collateral order doctrine, we have jurisdiction over an interlocutory order if it "(1) conclusively determines the disputed question, (2) resolves an important issue completely separate from the merits of the action, and (3) is effectively unreviewable on appeal from a final judgment." <u>Sell v. U.S.</u>, 539 U.S. 166, 176 (2003) (citation and internal quotation marks omitted). Orders denying the press or public access to court proceedings or records generally constitute "collateral" decisions and are immediately appealable, "regardless of the pendency of the underlying action." <u>U.S. v. Valenti</u>, 987 F.2d 708, 712 (11th Cir. 1993) (quoting <u>In re Petition of Tribune Co.</u>, 784 F.2d 1518, 1521 (11th Cir. 1986)).

The government argues that because the order requires it and the defendant "to update the Court in writing as to whether facts and circumstances have changed to permit the whole or partial unsealing" of the docket entries at issue, the order does not conclusively determine the disputed question. We disagree. As to Ochoa, each of the requirements of the collateral order doctrine are satisfied. Therefore, we have jurisdiction to hear his appeal.

LOCAL R. 7.1(F)[8] and because it rehashed matters already ruled upon in the <u>Ochoa-Vasquez</u> case.

Local Rule 7.1(F) requires parties moving for "relief in whole or in part, upon the same or any alleged different state of facts" previously submitted to a different judge, to submit an "affidavit setting forth the material facts and circumstances surrounding each prior application." The Rule puts the burden on the movant to illuminate prior motions and rulings in order to prevent duplication, inconsistent rulings, and waste of judicial resources.

Ochoa's first <u>Bergonzoli</u> motion, presented to a substitute judge, requested that the entire case be unsealed. His second motion (49 pages long with 1000 pages of exhibits), presented to the presiding judge on 7/3/03, sought the same relief. It thus fell within the ambit of Local Rule 7.1(F) as a previously refused motion, but Ochoa

---

[8]Local Rule 7.1(F) reads:

> **Applications Previously Refused.** Whenever any motion or application has been made to any Judge or Magistrate Judge and has been refused in whole or in part, or has been granted conditionally, and a subsequent motion or application is made to a different Judge or Magistrate Judge for the same relief in whole or in part, upon the same or any alleged different state of facts, it shall be the continuing duty of each party and attorney seeking such relief to present to the Judge or Magistrate Judge to whom the subsequent application is made an affidavit setting forth the material facts and circumstances surrounding each prior application, including: (1) when and to what Judge or Magistrate Judge the application was made; (2) what ruling was made thereon; and (3) what new or different facts and circumstances are claimed to exist which did not exist, or were not shown, upon the prior application. For failure to comply with the requirements of this rule, any ruling made on the subsequent application may be set aside sua sponte or on ex parte motion.

13

did not file a clarifying affidavit, as that Rule requires. On appeal, he fails to cite any error in the district court's application of that Rule, and we find none.[9]

Instead, Ochoa points out that his 1/29/04 "Supplemental Motion to Unseal New Sealed Matters," stricken by the district court with the 7/3/03 motion as a "related paper," seeks documents sealed <u>after</u> the 5/23/03 unsealing order. Thus, the substitute judge did not consider unsealing those documents. However, Local Rule 7.1(F) applies to motions made "upon the same or any alleged different state of facts." As noted above, one purpose of the Rule is to inform the district court of "new or different facts and circumstances ... claimed to exist which did not exist, or were not shown, upon the prior application." <u>See</u> Local Rule 7.1(F). Because Ochoa did not file an affidavit explaining what was presented to and ruled on by the predecessor judge, as required by Local Rule 7.1(F), the district court was justified in refusing to reach the merits of his supplemental motion as well.

As for the district court's second grounds for striking the motion, Ochoa's failure to file a Local Rule 7.1(F) affidavit understandably would lead a district judge

---

[9]Arguably, the Local Rule only permits the district court to strike "any <u>ruling</u> made on the subsequent application" and thus does not permit it to strike a <u>motion</u> for failure to comply with the affidavit requirement. <u>See</u> Local Rule 7.1(F) (emphasis added). However, we will not construe the Rule as requiring the district court to enter an order on a motion when the party has failed to comply with the affidavit requirement, only to then be permitted to <u>sua sponte</u> set aside that order. In addition, "this circuit gives great deference to a district court's interpretation of its local rules." <u>Clark v. Housing Authority of City of Alma</u>, 971 F.2d 723, 727 (11th Cir. 1992).

14

to perceive his voluminous motion as duplicating similar matters previously litigated in Ochoa's own case. In fact, Ochoa's motion raised issues that could not be resolved in the Ochoa-Vasquez case. He is thus free to renew his motion -- in compliance with Local Rule 7.1(F) -- to unseal records in the district court, at least with respect to the newly sealed documents or newly discovered evidence.

Even if the Bergonzoli judge erred in refusing Ochoa's renewed motion, that error would not be a valid basis for reversing Ochoa's criminal conviction. Ochoa asserts that he was prejudiced at trial by the sealing of the Bergonzoli case because it hindered his ability to evaluate Bergonzoli as a possible trial witness. He also asserts that the sealing of Bergonzoli records hindered his ability to litigate a Sixth Amendment claim against Perez.

These arguments are unpersuasive. First, Ochoa has failed to demonstrate that he would have called Bergonzoli as a witness, let alone that Bergonzoli's testimony would have made any difference in the outcome of the trial. And our review of the sealed files reveals nothing exonerating Ochoa. Further, Ochoa's purported disqualification claim against Perez is also unavailing.[10] Finally, the information

---

[10]Ochoa, alleging that Perez previously represented him, sought to have Perez disqualified from representing Bergonzoli, a potential witness in Ochoa's trial. However, Bergonzoli was not called as a witness and thus Perez has not represented a witness against Ochoa. And Ochoa has made no showing that Perez prejudiced his trial in any way. Ochoa also argues that Perez should have been disqualified from representing Bergonzoli during Ochoa's attempt to unseal files in Bergonzoli's criminal case. However, the Court need not address Perez's potential conflict of interest in

15

about Bergonzoli's participation in the Program does not diminish the substantial evidence against Ochoa; it is merely a diversion. Under these circumstances, Ochoa has failed to demonstrate that potential First Amendment violations in the Bergonzoli case prejudiced his defense, and he is therefore not entitled to a new trial on that basis.

## B.  Secret Docketing Procedures and Denial of Access to Court Files  in Ochoa-Vasquez

Many defendants prosecuted in connection with Operation Millennium, including co-defendants in Ochoa's own case, agreed to cooperate with the government in exchange for plea bargains. Seeking to protect these defendants and other confidential informants used in Operation Millennium, the parties agreed to seal many of the criminal proceedings.

Asserting his First Amendment right of access to criminal proceedings as a member of the public, Ochoa asked the Ochoa-Vasquez district court to unseal files in seven cases, including his own.[11] He also challenged the use of secret docketing procedures by the district court in three of those cases: Ochoa-Vasquez, Bergonzoli,

---

representing Bergonzoli in Bergonzoli's own case since Ochoa did not appeal the denial of his initial motion, and his renewed motion addressing that issue was properly refused under Local Rule 7.1(F).

[11]Besides Ochoa-Vasquez and Bergonzoli, Ochoa sought access to records in U.S. v. Correa-Valdez, No. 95-Cr-813-MIDDLEBROOKS (S.D.Fla.), U.S. v. Ramon, No. 99-71-Cr-HIGHSMITH (S.D.Fla.), U.S. v. Escaf de Saldarriaga, No. 99-Cr-433-SEITZ (S.D.Fla.), U.S. v. Prado, No. 99-27-Cr-DIMITROULEAS (S.D.Fla.), and U.S. v. Springette, No. 98-Cr-49-BOWEN (S.D.Ga.).

and U.S. v. Correa-Valdez. He pointed to entries in the Ochoa-Vasquez record that reveal an ad hoc system under which the district court sealed judicial proceedings, records, and entire criminal cases from public scrutiny.[12]

In Ochoa-Vasquez, magistrate judges kept orders and transcripts of proceedings from the public docket in at least two instances pertaining to a co-defendant, Orlando Sanchez-Cristancho (Sanchez): (1) his initial appearance hearing and (2) his status/bond hearing. At his initial appearance hearing, both the government and Sanchez's counsel asked the judge to seal the order and transcript. The magistrate judge consented by making an oral ruling, ordering the clerk of court to keep records sealed, and directing "that they be held in the vault and not docketed."[13]

---

[12]Although S.D.FLA.LOC.R. 5.4 provides for sealing documents upon the request of a party, no procedures exist under which a district court can remove an item from the public docket or refuse to publicly docket a filing. In fact, the Local Rule implies that sealed matters are to be placed and remain on the public docket, requiring the Clerk's office to "note on each [sealed file's] envelope the date of filing and docket entry number." S.D. FLA. LOCAL R. 5.4(B)(1).

[13]The full colloquy was as follows:

| THE COURT: | …Anything else that I've left out? |
| [Sanchez's counsel]: | Judge, there's just -- |
| [Government]: | There's the matter of docketing. |
| MR. FOREMAN: | There's just one other administrative matter. |
| THE COURT: | My feeling is that you just work that out however you can. I don't |

**1. The Public's First Amendment Right of Access to Criminal Proceedings**

The press and public enjoy a qualified First Amendment right of access to criminal trial proceedings. Globe Newspaper Co. v. Superior Court for the County of Norfolk, 457 U.S. 596, 603 (1982); Chicago Tribune Co. v. Bridgestone/Firestone, Inc., 263 F.3d 1304, 1310 (11th Cir. 2001).[14] Open criminal proceedings have been

> know what to do with it, if you want to -- me to defer, I guess I could verbally order that -- that the clerk retain custody of these documents and that they be filed either on Wednesday or however [Magistrate] Judge Vitunac orders it, and that they be held in the vault and not docketed.

| | |
|---|---|
| [Government]: | That would work for us, Judge. |
| [Sanchez's counsel]: … | That works, your Honor. |
| THE COURT: | … So, I guess they can just put it in the vault -- |
| [Government]: | That's fine, Judge. |
| THE COURT: | -- without docketing. |

A similar procedure was followed at Sanchez's status and bond hearing.

[14]This right extends not only to the criminal trial itself, but also to other integral parts of the trial process such as voir dire proceedings and preliminary hearings. Press-Enterprise Co. v. Superior Court of California, 464 U.S. 501 (1984) ("Press-Enterprise I") (voir dire proceedings); Press-Enterprise Co. v. Superior Court, 478 U.S. 1 (1986) ("Press-Enterprise II") (preliminary hearings). It also attaches to the transcripts of these proceedings. See Press-Enterprise II, 487 U.S. at 3, 13-15 (transcript of preliminary hearing). Other Circuits have also recognized a right of access to plea hearings, plea agreements, and related documents. Oregonian Publishing Co. v. United States Dist. Court, 920 F.2d 1462, 1465-66 (9th Cir. 1990) (right of access to plea agreements and related documents); U.S. v. Danovaro, 877 F.2d 583, 589 (7th Cir. 1989) (right to attend proceedings at which pleas are taken and inspect the transcripts); U.S. v. Haller, 837 F.2d 84, 86-87 (2d Cir. 1988) (right of access to plea hearings and plea agreements); In re Washington Post Co., 807 F.2d 383, 388-90 (4th Cir. 1986) (right of access to plea hearings, sentencing hearings, and documents filed in connection thereto).

an "indispensable attribute of an Anglo-American trial" for centuries. Richmond Newspapers v. Virginia, 448 U.S. 555, 569 (1980) (plurality opinion); see also Nixon v. Warner Communications, Inc., 435 U.S. 589, 597-98 (1978) (holding that the press and public also enjoy a common-law right of access to judicial records). Public trials and judicial proceedings are "rooted in the 'principle that justice cannot survive behind walls of silence,' and in the 'traditional Anglo-American distrust for secret trials.'" Gannet Co. v. DePasquale, 443 U.S. 368, 412 (1979) (quoting Sheppard v. Maxwell, 384 U.S. 333, 349 (1966), and In re Oliver, 333 U.S. 257, 268 (1948)) (Blackmun, J. concurring in part); Richmond Newspapers, 448 U.S. at 591 (Brennan, J., concurring) (recognizing "this nation's historic distrust of secret proceedings, their inherent dangers to freedom, and the universal requirement of our federal and state governments that criminal trials be public") (quoting In re Oliver, 333 U.S. at 273).

## 2. Constitutionality of Secret Docketing Procedures in Ochoa-Vasquez

In Valenti, 987 F.2d at 715, this Circuit held that a "dual-docketing system," or "sealed docket," in the Middle District of Florida violated the press and public's First Amendment right of access to criminal proceedings, and declared it facially unconstitutional. In striking down that system, we recognized that public docket

sheets are essential to provide "meaningful access" to criminal proceedings.[15] Id.

Thus, we held that the press and public's qualified First Amendment right to access criminal proceedings extends to the proceedings' docket sheets. Id.; accord Hartford Courant Co., 380 F.3d at 91 (concerning the secret docketing procedures in Connecticut state courts).

Because the district court's orders unsealing dockets here brought them in compliance with Valenti, the secret-docketing issue is not properly before us. We nevertheless exercise our supervisorial authority to remind the district court that it cannot employ the secret docketing procedures that we explicitly found unconstitutional in Valenti.

### 3. Denial of Access to Specific Documents in Ochoa-Vasquez

The orders sealing specific documents in Ochoa-Vasquez also violate First Amendment standards because no finding was made on the record to rebut the

---

[15]The docket sheet forms an integral part of a criminal proceeding, acting as both an index and a publication. See Hartford Courant Co. v. Pellegrino, 380 F.3d 83, 93-94 (2d Cir. 2004). As an index, the docket catalogues all the proceedings and information taken before a court in that case. It permits both the court and observers to locate documents and proceedings that otherwise would be lost within the court's vast record collections. See, e.g., Brown v. Lester, 21 Miss. 392, 394 (1850). It also allows one to quickly determine the status of a case, the actions of the parties, and the determinations of the judge, without requiring the inspection of every item in the case file. Id. As a publication, the docket sheet provides the public and press with notice of case developments. Hartford Courant Co., 380 F.3d at 93-94. This role assumes particular importance when the court is considering sealing a proceeding or judicial record. Id.; Commonwealth v. Doe, 648 N.E.2d 1255, 1260 (Mass. 1995).

20

presumption of openness. A party may overcome that presumption if it can show "an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." Press-Enterprise I, 464 U.S. at 510; Valenti, 987 F.2d at 713. When sealing proceedings or documents, a court must articulate the overriding interest "along with findings specific enough that a reviewing court can determine whether the closure order was properly entered."[16] Press-Enterprise I, 464 U.S. at 510; Kooistra, 796 F.2d at 1391 & n.1. The court must also provide members of the public and press who are present with notice and an opportunity to be heard on a proposed closure. Valenti, 987 F.2d at 713; U.S. v.

[16]This Circuit has said that these findings "should include the reason for the closure, the evidence that supports the need for the closure, the number of persons excluded and the number allowed to remain, and the presence or absence of the press." Douglas v. Wainwright, 714 F.2d 1532, 1546 n.16 (11th Cir. 1983) (applying First Amendment standard to defendant's Sixth Amendment right to a public trial).

Of course, disclosure of evidence supporting the need for continued secrecy may in some cases reveal sensitive information that, if publicized, would defeat the purpose of keeping the proceeding or record sealed in the first place. U.S. v. Kooistra, 796 F.2d 1390, 1391 (11th Cir. 1986). But the law permits the district court to seal parts of the denial of access order itself so far as the facts sealed are necessary to protect the higher values at issue, and where "the district court makes every effort to explain as much of its decision as possible on the public record to enable an interested person to intelligently challenge the decision." Washington Post v. Robinson, 935 F.2d 282, 289 n.9 (D.C. Cir. 1991) (holding that, in sealing a plea agreement, "the trial court may file its findings under seal if it is necessary to protect the secrecy of the plea agreement…[but] should only seal that part of its findings that is necessary to protect the secrecy of the sealed plea agreement, and it must make every effort to explain as much of its decision as possible on the public record to enable an interested person to intelligently challenge the decision"); accord U.S. v. Haller, 837 F.2d 84, 87 (2d Cir. 1988); In re Washington Post Co., 807 F.2d at 391. Thus, the sensitive nature of the facts poses no barrier to compliance with the First Amendment. The district court can enable meaningful appellate review of its order and provide as much information to the public as possible, while still protecting the higher values at stake.

Alcantara, 396 F.3d 189, 202-03 (2d Cir.2005) (conducting a proceeding in judge's robing room violated the public and press's First Amendment rights).

Neither the Ochoa-Vasquez district court's sealing orders nor its denials of access to court records articulated the reason for the closure or the evidence that supported the need for closure. Douglas, 714 F.2d at 1546 n.16. Those orders denying access (D.E. 1193 & 1351), therefore, do not comply with our First Amendment jurisprudence, and we reverse and remand them for reconsideration in light of the established precedent. Nevertheless, the document sealing in this case does not warrant a new trial because Ochoa was eventually granted access to the majority of documents and he has not shown prejudice. See U.S. v. Edwards, 211 F.3d 1355, 1358 (11th Cir. 2000) (defendant must show prejudice to receive new trial under Speedy Trial Act); U.S. v. Chastain, 198 F.3d 1338, 1348 (11th Cir. 1999) (government's violation of discovery rules results in reversal only if the defendant establishes actual prejudice). Additionally, as noted earlier, Ochoa sought documents containing information about other defendants' participation in the Program even though it was unrelated to his criminal conduct and evidence concerning the Program was later barred from trial.

## III. EMPANELMENT OF AN ANONYMOUS JURY

Before Ochoa's trial, the government moved for the empanelment of an innominate and partially sequestered jury. In support of its motion, the government offered an affidavit from a DEA agent detailing efforts of the Medellín drug cartel and Operation Millennium defendants to obstruct justice through threats and violence. To protect jurors from intimidation, the government requested that the names, addresses, and places of employment of prospective jurors and their family members not be disclosed. The government also sought to have the United States Marshals Service transport the jurors to the courthouse and maintain custody over them throughout the court day.[17] The district court granted the government's motion over Ochoa's opposition. Both Ochoa and the government proposed jury questions to be used on voir dire, but the court rejected those in favor of its own voir dire questions.[18] Ochoa now alleges that the district court improperly empaneled an anonymous jury, that it conducted an insufficient voir dire, and that juror anonymity allowed the

---

[17]It is common practice for marshals to maintain custody over jurors during the day. Additionally, they eat lunch together, take breaks together, and do not wander about the courthouse. Anonymous jurors often do not commute directly to and from the courthouse; instead, they are transported by marshals to the courthouse from an undisclosed location. See, e.g., U.S. v. Ross, 33 F.3d 1507, 1519 (11th Cir. 1994); U.S. v. Paccione, 949 F.2d 1183, 1191 (2d Cir. 1991).

[18]In the vast majority of federal cases, the judge conducts voir dire and determines which questions will be asked of jurors. 9 MOORE'S FED. PRAC. § 47.10[3][e][i], at 47-30 (3d ed. 2004).

prosecution to exercise its peremptory challenges in a racially discriminatory manner in violation of <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986).[19]

The district court commenced the jury-selection proceedings by explaining, and later reiterating, that jurors must come to the case "with an open mind," so that "any verdict [reached] will be based solely on the evidence ... and not on any other consideration." It then explained that the burden was on the government to prove its allegations beyond a reasonable doubt and that the defendant bore no burden to disprove the allegations. With this background, the district court proceeded to voir dire.

It first asked the potential jurors if they knew any of the attorneys or the defendant.[20] Two potential jurors raised their hands. The court questioned both, but neither had a close relationship with anyone involved in the case, and they stated that it would not affect their ability to decide the case fairly and impartially. Neither of those potential jurors ultimately served as a juror or alternate.

---

[19]Ochoa also argues that the district court erroneously refused to allow his counsel to return an unsolicited telephone call from an alternate juror after the verdict. However, nothing about the phone call suggested impropriety, and the district court did not abuse its discretion in denying Ochoa's request in order to preserve the juror's anonymity. U.S. v. Prosperi, 201 F.3d 1335, 1340 (11th Cir. 2000) (investigation of alleged juror misconduct "is committed to the discretion of the district court and is reviewed only for an abuse of that discretion").

[20]Because the district court was unable to find enough jurors in the first group of potential jurors, a second group was questioned. They were asked substantially the same questions as the first, although the wording varied in some instances.

The district court then moved on to the larger issue of pretrial publicity, asking what (if any) publicity each juror had been exposed to and what (if any) effect that publicity might have had.[21]  It individually questioned jurors who had knowledge of the case to determine the nature of the publicity to which they had been exposed, whether they had formed an opinion, and if the publicity would affect their ability to perform fairly and impartially.  The court then excused those who stated that it would affect their ability to perform impartially.  Ultimately, no one who had been exposed to pretrial publicity served as a juror or alternate.

The district court next asked the venire if any of them had previously served as a juror in state or federal court.  It individually questioned those who had to determine when they had served, whether the case was civil or criminal, in state or federal court, and if they had reached a verdict.  To those who previously had served on civil cases, the district court reiterated that the burden of proof was higher in this criminal case.

To expose any pro-law-enforcement bias, the district court asked the venire whether they had any family or friends in law enforcement.  It then questioned those

_____

[21]The district court addressed the potential jurors as follows: "I indicated to you the case, the name of the defendant, and the allegations against the defendant.  I emphasize again they are allegations, not evidence of any kind.  Does anybody know anything about this case before coming into court?  Anything that you might have seen on TV, read in the paper, heard on the radio, or from any other source?  If you have heard or seen anything about this case, please raise your hand."

who responded to determine the nature of the law-enforcement connection and what effect it would have on their ability to perform fairly and impartially. The district court struck for cause those venire members whose answers suggested that they might be affected by a law-enforcement tie. It also questioned the potential jurors to expose any bias based on the drug-related nature of the charges, reiterating that the government's allegations did not constitute evidence against Ochoa.[22] In response to this question more than one fifth of the venire members raised their hands and provided explanation. None ultimately served as a juror or alternate.

---

[22]Specifically, the district court addressed the venire as follows:

I mentioned to you earlier what the allegations were in the case, and again I underscore that they are allegations and not evidence of any kind. But essentially the allegations are two counts, one of possession with intent to distribute or conspiracy with intent to distribute cocaine, and the other conspiracy to import cocaine.

Is there anything about the nature of those allegations that would affect your ability to be a fair and impartial juror in the case? They say the allegations deal with cocaine. Does anybody have any feelings one way or the other that you would be unable to put your own feelings or thoughts about those allegations out of your mind for purposes of basing your verdict solely on the evidence that you hear in this courtroom and follow the Court's instructions as to what the law is?

Some people think, for example, that the laws relating to possession and importation of cocaine are too harsh, some may think they're lenient. Regardless of your personal views, you will be asked to set them aside from consideration in this case and base your verdict solely on the evidence you hear in this case and the Court's instruction to you on the law.

Does anybody have a feeling so strongly held that you would not be able to put them aside for purposes of this case? If you can't do that, please raise your hand.

After asking if anyone had a problem, disability, or schedule that would prevent them from serving as a juror, the district court moved on to elicit family and employment information from each venire member. It individually questioned each potential juror about his or her employment, marital status, and spouse's employment.

It then asked the venire to state any other reason why they might not be able to render a fair verdict based on the evidence and in accord with the court's instructions on the law, or anything the government or defense might want to know. Several jurors took that opportunity to disclose information about their feelings on drugs or ties to drug-related problems. For example, one potential juror expressed a bias regarding the drug issue because a friend had overdosed; another revealed that her husband had served as a witness in a drug case; another expressed strong feelings about drugs; and still another revealed that his son was an undercover DEA agent. Each of those venire members was excused by the court.

During jury selection, Ochoa objected to the prosecution's use of its fourth peremptory challenge, claiming that it had demonstrated a pattern of excluding Hispanic males in violation of Batson v. Kentucky. The government offered to explain each prior strike, but since the other jurors had already been excused and left the courtroom, the district court only asked for an explanation for the strike Ochoa challenged. The government responded that the potential juror was a photographer,

whereas it wanted to empanel jurors with more of a professional background. The district court accepted that explanation for the government's fourth challenge and did not determine the race or ethnicity of the other stricken jurors who had been excused.

Ochoa challenged the government's sixth peremptory challenge under Batson as well. This time the government argued that the potential juror was not Hispanic, and that it had struck him because he was a state court juror clerk. It did not want somebody who participates in the jury selection process serving on the jury. The district court again accepted the government's explanation. At all times both the government and the district court maintained that they could not determine whether the potential jurors were Hispanic simply from looking at them and hearing their voices.[23]

The district court did not call back the previously excused jurors or otherwise determine their ethnicity during the trial. After the trial the court did supplement the record with questionnaires wherein jurors indicated their racial and ethnic background. The names of the jurors remained undisclosed.

---

[23]As discussed earlier, during voir dire the government and defense counsel did not have the names of the jurors or any self-reported ethnic or race information.

## A. The Court's Decision to Empanel an Anonymous Jury[24]

Juror anonymity is a relatively modern concept. Its first reported use was in a 1977 trial involving fifteen defendants from a Harlem, New York crime syndicate. U.S. v. Barnes, 604 F.2d 121 (2d Cir. 1979). Since then, however, significant numbers of federal and state courts throughout the country have utilized the procedure to protect jurors, prevent jury tampering and limit media influence.[25]

This Court has recognized that the use of an anonymous jury is a "drastic measure" that implicates the defendant's constitutional right to a presumption of innocence by "rais[ing] the specter that the defendant is a dangerous person from whom the jurors must be protected ...." Ross, 33 F.3d at1519. Thus, a court should only empanel an anonymous jury "in limited and carefully delineated circumstances." Id. at 1519. "In general, the court should not order the empaneling of an anonymous jury without (a) concluding that there is a strong reason to believe the jury needs protection, and (b) taking reasonable precautions to minimize any prejudicial effects

---

[24]Under 28 U.S.C. § 1863(b)(7), a district court may empanel an anonymous jury in any case in which "the interests of justice so require." Its decision to empanel an anonymous jury is reviewed for abuse of discretion. U.S. v. Ross, 33 F.3d 1507, 1519 (11th Cir. 1994).

[25]For arguments for and against the use of anonymous juries, see State v. Hill, 749 N.E.2d 274 (Ohio 2001) (upholding a local rule that makes juror anonymity a standard practice); N. J. King, Nameless Justice: The Case for the Routine Use of Anonymous Juries in Criminal Trials, 49 VAND.L.REV. 123 (1996); A. Abramovsky and J. I. Edelstein, Anonymous Juries: In Exigent Circumstances Only, 13 ST. JOHN'S J. LEGAL COMMENT. 457 (1999).

on the defendant and to ensure that his fundamental rights are protected." Id. at 1520

(citation and internal quotation marks omitted).

In Ross, we explained that some combination of the following factors may

support the empanelment of an anonymous jury:

> (1) the defendant's involvement in organized crime, (2) the defendant's participation in a group with the capacity to harm jurors, (3) the defendant's past attempts to interfere with the judicial process, (4) the potential that, if convicted, the defendant will suffer a lengthy incarceration and substantial monetary penalties, and (5) extensive publicity that could enhance the possibility that jurors' names would become public and expose them to intimidation and harassment.

Id. Applying these factors, we have held that an anonymous jury may be justified

even when the defendant has not attempted to interfere with the current proceedings,

if he belongs to a group that has a history of interfering with other judicial

proceedings. See U.S. v. Bowman, 302 F.3d 1228, 1238-39 (11th Cir. 2002)

(upholding use of anonymous jury when defendant was the leader of a motorcycle

gang with history of violence and witness intimidation). Similarly, the Fifth Circuit

has held that although mere allegations or inferences of potential risk are an

insufficient basis for an anonymous jury, "[a] lesser showing might be adequate

where specific evidence exists linking the defendant to organized crime" and where

obstruction of justice and violence are the organization's "normal course of business."

U.S. v. Krout, 66 F.3d 1420, 1427 & n.7 (5th Cir. 1995).

30

Here sufficient evidence supported all five of the <u>Ross</u> factors. Specific evidence linked Ochoa to an organized criminal organization with a history of violence and obstruction of justice.[26] A DEA agent's affidavit outlined contemporary efforts by Colombian drug traffickers, in response to Colombia's extradition of Operation Millennium defendants, to obstruct justice by establishing a group to kill suspected informants.[27] Moreover, Ochoa faced a lengthy sentence if convicted, and his prior connections to the Medellín cartel promised to make this a high-profile trial. The combination of these factors supports a conclusion that the jury needed special protection. We therefore find no abuse of discretion in the court's decision to empanel an anonymous jury.

## B.   Precautionary Measures

Courts cite two distinct concerns arising from the use of an anonymous jury: (1) that anonymity will inhibit the meaningful exercise of peremptory challenges; and (2) that anonymity will diminish the presumption of innocence by raising the

---

[26]A DEA agent's affidavit also detailed the efforts of the Medellín cartel to subvert the Colombian judiciary in the 1980s, and described Ochoa's history of affiliation with that organization, noting that the Medellín Cartel funded a 1985 assault on the Colombian Palace of Justice to kill members of the Colombian judiciary and destroy government files. We do not rely on this information, however, because it is not current and it is unclear whether Ochoa still has ties to this particular organization, assuming it still exists. Nonetheless, there is sufficient evidence of current connections to entities that could reasonably be deemed to pose a threat to the jury.

[27]The government's affidavit alleged that this group, "Muerte A Sapos Americanos" ("Murder to American Snitches") or M.A.S.A., had already killed at least five people suspected of cooperating with U.S. law enforcement.

appearance that the defendant is a dangerous person.  U.S. v. Vario, 943 F.2d 236, 241 (2d Cir. 1991).

The Ross panel focused on the second concern when noting that juror anonymity is a "drastic measure" that requires "reasonable steps to minimize any prejudicial effects." 33 F.3d at 1519, 1521-22.  It noted that the threat to a defendant's presumption of innocence is "minimized when the trial court gives the jurors a plausible and nonprejudicial reason for hiding their identities."  Id. at 1520 (citing U.S. v. Thomas, 757 F.2d 1359, 1365 (2d Cir. 1985) (jurors were told that anonymity was to prevent unwanted press attention) and U.S. v. Scarfo, 850 F.2d 1015, 1026-28 (3d Cir. 1988) (jurors were told that anonymity allowed them to consider the case without apprehension and assured that both defendant and the government receive a fair trial)).

In a more recent case, however, we noted that "the district court's failure to give the instruction does not warrant reversal." Bowman, 302 F.3d at 1239.  Because the defendant in Bowman did not request such an instruction, he waived any right he had to it, and he could only appeal on the basis of plain error.  Id.; see also U.S. v. Mansoori, 304 F.3d 635, 652 (7th Cir. 2002) (despite the district court's willingness to give a cautionary instruction regarding anonymity, defendants' failure to remind it to do so waived that issue); Vario, 943 F.2d at 241 (defendant did not object to

32

district court's jury charge and therefore waived his right to explicit instructions on juror anonymity).

Here Ochoa argued adamantly against the use of a curative instruction. He contended that telling the jury a curative lie would inevitably compound the prejudice imposed by juror anonymity because "it is inconceivable that the jury, at least in this case, would be fooled by such lies." D.E. 982 at 8. Moreover, he claimed that giving the jury a truthful explanation would unduly prejudice his presumption of innocence. Id. at 10. While Ochoa did hedge his position by claiming that the district court "should fashion an agreeable (even if ultimately ineffectual) instruction for the jury," he failed to request such an instruction during voir dire or in the final jury charge. He has thus waived that issue absent plain error, of which this Court finds none.[28]

---

[28]While the district court did not instruct the venire explicitly on the anonymity procedure, it did instruct the jurors repeatedly and at length about the presumption of innocence. During voir dire the district court reiterated that jurors have a duty to perform impartially; that they should consider only the evidence in the case in coming to conclusions; that the government bore the burden of proving Ochoa's guilt; and that Ochoa was not required to submit proof of his innocence. Additionally, after closing arguments the district court again instructed the jury:

It will be your duty to decide whether the Government has proved beyond a reasonable doubt the specific facts necessary to find the defendant guilty of the crimes charged in the indictment. You must make your decision only on the basis of the testimony and other evidence presented here during the trial and you must not be influenced in any way by either sympathy or prejudice for or against the defendant or the Government.

. . . The indictment or formal charge against any defendant is not evidence of guilt. Indeed every defendant is presumed by the law to be innocent[;] the law does not require a defendant to prove innocence or to produce any evidence at all. The Government has the burden of proving a defendant guilty beyond a reasonable doubt and if it fails to do so you

33

In addition to implicating the defendant's presumption of innocence, juror anonymity deprives the defendant of information that may be helpful in making appropriate challenges, especially peremptory challenges, during jury selection. Mansoori, 304 F.3d at 650; U.S. v. DiDomenico, 78 F.3d 294, 301-02 (7th Cir. 1996); U.S. v. Edmond, 52 F.3d 1080, 1090 (D.C. Cir. 1995). Thus, where juror anonymity is warranted, "the defendant's fundamental right to an unbiased jury is sufficiently guaranteed by the court's conduct of a voir dire that can uncover any bias towards issues in the case or to the defendant himself." Ross, 33 F.3d at 1520. A district court, then, must elicit sufficient information during voir dire to permit a defendant

---

must find the defendant not guilty. . .

. . . Proof beyond a reasonable doubt therefore is proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your affairs. If you are convinced that a defendant has been proved guilty beyond a reasonable doubt say so. If you are not convinced say so.

As I said earlier, you must consider only the evidence that I have admitted in the case. The term evidence includes the testimony of witnesses and the exhibits admitted in the record. Remember that anything the lawyers say is not evidence in the case. It is your own recollection and interpretation of the evidence that controls. What the lawyers say is not binding upon you. Also you should not assume from anything I may have said that I have an opinion concerning any of the issues in this case. Except for my instruction to you on the law you should disregard anything I may have said during the trial in arriving at your own decision concerning the facts. . . .

Other circuits have relied in part upon the district court's jury instructions regarding the presumption of innocence when affirming convictions in anonymous-jury cases. See, e.g., Vario, 943 F.2d at 241; Mansoori, 304 F.3d at 652; U.S. v. Edmond, 52 F.3d 1080, 1093 (D.C. Cir. 1995); U.S. v. Crockett, 979 F.2d 1204, 1216 (7th Cir. 1992); U.S. v. Tutino, 883 F.2d 1114, 1133 (1st Cir. 1989).

to intelligently exercise both his for-cause and peremptory challenges.  See Barnes, 604 F.2d at 142.

Here Ochoa contends that "juror anonymity and enhanced security were material issues that [he] was constitutionally entitled to explore in voir dire," and that the district court erred in preventing him from doing so.  Yet he cites no case, and we have found none, supporting this position.  Nor have we found a case even suggesting voir dire as a means of combating potential prejudice to a defendant's presumption of innocence that may arise from anonymity.  Rather, anonymity decreases the parties' knowledge of the jurors, thus diminishing their ability to use peremptory challenges.  Mansoori, 304 F.3d at 650.  Voir dire is highlighted, then, as a means of compensating for this lack of knowledge, id. at 652, not  as a means of investigating the potential effect of anonymity on the jurors' ability to presume the defendant innocent.

In some instances where juror prejudices are reasonably suspected, courts require voir dire questions to address specific topics.  See Ham v. South Carolina, 409 U.S. 524, 527 (1973) (racial bias in civil rights case); Morgan v. Illinois, 504 U.S. 719, 735-36 (1992) (jurors' views on death penalty); Jordan v. Lippman, 763 F.2d 1265, 1281-82 (11th Cir. 1985) (extensive pre-trial publicity).  While there have been numerous opinions discussing anonymous juries, none suggests that juror anonymity

should be similarly addressed with specific voir dire questions. In fact, requiring such questions on that score would be contrary to the generally accepted practice for minimizing prejudice, which is to downplay (not accentuate) the significance of the juror anonymity procedure. See Abramovsky, supra at 457 (noting that many courts conceal the real reason for using an anonymous jury and instead provide a non-prejudicial explanation to the jury); Eleventh Circuit Pattern Jury Instructions (Criminal) at 533 (2003) (explaining that anonymity "will serve to discourage inquiries from those seeking information and otherwise preserve your privacy ... against unwanted and unsolicited publicity, telephone calls, letters, questions, and the

like").[29]  Thus, Ochoa had no right to have the jury questioned specifically about the anonymity procedure.[30]

Ochoa also claims that the use of an anonymous jury rendered his peremptory challenges ineffective because he did not know the jurors' names, addresses, or places of employment.  He claims that he lacked sufficient information by which to prudently exercise his strikes, resulting in the placement of an IRS agent on his jury. There exists skepticism among jurists about the ability of lawyers to pick favorable jurors, DiDomenico, 78 F.3d at 301, even when granted unfettered access during voir

---

[29]See, e.g., Ross, 33 F.3d at 1520-21 & n.27 (affirming district court's explanation that anonymity procedure was used because of the high degree of publicity and to protect jury from unwanted contact by media, not "because of any apprehension on the part of this Court that you would have been endangered or subject to improper pressures if your names had been disclosed"); U.S. v. Darden, 70 F.3d 1507, 1533 (8th Cir. 1995) (concluding that prejudice was minimized by trial court's explanation that jurors were anonymous to protect them from media exposure); U.S. v. Childress, 58 F.3d 693, 702 (D.C. Cir. 1995) (minimizing prejudice by downplaying significance of anonymity procedure); U.S. v. Thai, 29 F.3d 785, 801 (2d Cir. 1994) (downplaying anonymity by suggesting that it is a common practice in federal courts); Paccione, 949 F.2d at 1193 (publicity); Thomas, 757 F.2d at 1364 (publicity); Tutino, 883 F.2d at 1133 (common practice); U.S. v. Ferguson, 758 F.2d 843, 854 (2d Cir. 1985) (explaining that anonymity was used to protect privacy and save jurors from embarrassment); U.S. v. Boyd, 792 F.Supp. 1083, 1095 (N.D.Ill. 1992) ("reasonable precautions were taken to downplay the significance of using the juror's numbers instead of their names").  But see Scarfo, 850 F.2d at 1026-28 (suggesting that it is better to be frank with the jury than to provide them with a non-prejudicial reason for their anonymity).

[30]The dissent suggests that Ross, at a minimum, requires that jurors be questioned concerning the anonymity procedures.  Infra at 70.  However, the district court in Ross did not tell jurors that their anonymity served to protect them from the defendant, let alone question them concerning whether the anonymity procedure would affect their ability to presume the defendant innocent. Ross, 33 F.3d at 1520-21 & nn.27, 28.  Hence, Ross does not require that jurors be questioned regarding their response to the anonymity procedure.  Nor does the dissent cite any case requiring this.

37

dire.[31] Moreover, even if they can gainfully employ the information they receive, "the purpose of the voir dire is to ascertain disqualifications, not to afford individual analysis in depth to permit a party to choose a jury that fits into some mold that he believes appropriate for his case." Schlinsky v. U.S., 379 F.2d 735, 738 (1st Cir. 1967). And we must keep in mind that prosecutors are equally harmed by juror anonymity in this respect, as they likewise are hampered in exercising their peremptory challenges. Yet, so long as courts utilize peremptory challenges, we must consider the cost of depriving lawyers of information used in the exercise of that valued procedural right. DiDomenico, 78 F.3d at 301.

Here the district court appropriately applied its discretion in determining that this is one of those "drastic" cases in which the defendant's need for the maximum knowledge in exercising peremptory challenges is overridden by the jurors' interest in safety and the public's interest in preventing juror tampering. Additionally, while other judges might have conducted a more rigorous voir dire, Ochoa has not shown that it was insufficient to "uncover any bias towards issues in the case or to the defendant himself." Ross, 33 F.3d at 1520; see also U.S. v. Daniels, 986 F.2d 451,

---

[31]See R. Hastie, Is Attorney-Conducted Voir Dire an Effective Procedure for the Selection of Impartial Juries?, 40 AM. U. L. REV. 703, 721 (1991) (rejecting the conclusion that attorneys effectively identify favorable or unfavorable jurors).

454 (11th Cir. 1993) (district court has wide discretion in determining which questions will be asked during voir dire).

## C. Batson Challenge

Ochoa next contends that the district court erred in addressing his Batson challenge. Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712 (1986). He argues that its failure to require an explanation for each of the government's race-specific strikes, combined with its failure to make reviewable findings on the three prongs of the Batson test, is reversible error.

### 1. Standard of review

The Supreme Court in Batson established the now-familiar three-part inquiry for evaluating whether a peremptory strike was motivated by racial or ethnic discrimination. 476 U.S. at 79, 106 S. Ct. at 1712. It recently reaffirmed that standard in Johnson v. California, 125 S. Ct. 2410 (2005), and Miller-El v. Dretke, 125 S. Ct. 2317 (2005). First, the district court must determine whether the party challenging the peremptory strikes has established a prima facie case of discrimination by "establishing facts sufficient to support an inference of racial discrimination." Johnson, 125 S. Ct. at 2416; Central Alabama Fair Housing Ctr. v. Lowder Realty Co., 236 F.3d 629, 636 (11th Cir. 2000). Our precedent makes clear

that "the establishment of a prima facie case is an absolute precondition to further inquiry into the motivation behind the challenged strike." Lowder, 236 F.3d at 636.

If the objector makes a prima facie showing, the burden then shifts at step two to the striker to articulate a race-neutral explanation for the challenged strike. Johnson, 125 S. Ct. at 2416; U.S. v. Allen-Brown, 243 F.3d 1293, 1297 (11th Cir. 2001). However, the ultimate burden of persuasion "rests with, and never shifts from, the opponent of the strike. Thus, even if the [striker] produces only a frivolous or utterly nonsensical justification for its strike, the case does not end – it merely proceeds to step three." Johnson, 125 S. Ct. at 2417 (quotes and cite omitted). At step three, the district court determines the persuasiveness of the justification offered by the striker and decides whether the objector has carried its burden of proving purposeful discrimination. Johnson, 125 S. Ct. at 2416; U.S. v. Novaton, 271 F.3d 968, 1002-03 (11th Cir. 2001).

Here the district court found that Ochoa had not satisfied his burden of demonstrating a prima facie case. We give great deference to a district court's finding of whether a prima facie case of impermissible discrimination has been established:

Courts reviewing the resolution of a Batson challenge give great deference to a district court's finding as to the existence of a prima facie

case. <u>De novo</u> review is inappropriate. A district court's finding as to why a juror is excused is an issue of fact, and as such, it will not be disturbed on appeal unless it is clearly erroneous or appears to have been guided by improper principles of law.

<u>Allen-Brown</u>, 243 F.3d at 1296-97 (quotes and cites omitted); <u>Novaton</u>, 271 F.3d at 1002 (same); <u>Lowder</u>, 236 F.3d at 635 ("We review the district court's resolution of a <u>Batson</u> challenge under the clearly erroneous standard. As part of that review, we give great deference to the district court's finding as to the existence of a prima facie case") (quotes and cites omitted); <u>U.S. v. Stewart</u>, 65 F.3d 918, 925 (11th Cir. 1995) (stating that this Court owes "great deference" to the district court's prima-facie-case determination); <u>see also</u> <u>King v. Moore</u>, 196 F.3d 1327, 1334 (11th Cir. 1999) ("Whether a defendant has thus made a prima facie showing is (perhaps counterintuitively) treated as a question of fact to be decided by the trial judge.").

## 2. District Court's ruling on Ochoa's Batson claim

In Batson, the Supreme Court offered two examples of circumstances that may support a prima facie case of racial discrimination: "(1) engaging in a 'pattern' of strikes against venire members of one race, or (2) questions or statements during voir dire or in exercising challenges that suggest a discriminatory purpose." Lowder, 236 F.3d at 636 (citing Batson, 476 U.S. at 97, 106 S. Ct. 1712). At trial, Ochoa's Batson claim rested solely on allegations that the prosecution engaged in a discriminatory pattern of strikes against Hispanic venire members. At the time Ochoa first made his Batson claim, four Hispanic venire members had been struck by the government and three of them had left the courtroom. Ochoa's counsel, Mr. Black, asserted that those four jurors (numbers 051, 221, 234, and 379) were all Hispanic males. The government responded that "we haven't used our challenges for all Hispanic males." The evidence would later reveal that it had. The following exchange took place:

> MR. BLACK: ... We think the government is improperly using its peremptory challenges to excuse Hispanic male jurors.
>
> THE COURT: Does the government have a response?
>
> MR. RYAN: Judge, I could go down the list and give specific responses, but I don't believe we have made – we haven't used our challenges for all Hispanic males. There are some that –

THE COURT: Can you just deal with the one that you just did? I don't know who the others were, they are gone now.

. . .

MR. RYAN: ... as to this last person that you asked about, we note that he listed his profession as photographer. We are seeking jurors who [have] more of a professional background.

THE COURT: Okay.

MR. BLACK: ... All he said was he was a photographer, his wife is in accounting. If they have a challenge for that other than racial or place of natural [origin], again would be pure guesswork. So I think it is improper.

THE COURT: Well, I think he has given a reason for this latest challenge. How do you know who these other people were?

MR. BLACK: I kept track of them.

THE COURT: How do you know they were Hispanic?

MR. BLACK: Since we don't know their names, we can't tell from the surnames.

THE COURT: So you're going on the basis of looking at them?

MR. BLACK: What else do we have?

43

THE COURT: I don't know. You didn't make a challenge at the time and I have no way of knowing if that's what they were.

MR. BLACK: We can bring them back. Why don't we ask to have them back and put on the record what their background is? We made note from either accent or the way they looked.

THE COURT: Okay. I will note the objection on this one –

MR. RYAN: Can you put on the record that juror number 494, who the government accepted, is a male who appears to talk with an [accent] that would indicate Hispanic background, and the government accepted.[32]

After the government's sixth strike, Ochoa again objected on the basis of a "pattern" of racial strikes in violation of Batson, and the following exchange took place:

MR. BLACK: Object again under Batson, same racial characteristic.

...

MR. GREGORIE: Your Honor, Dick Gregorie for the government. Mr. Black, as he was with the previous ones, is wrong. This man is not Hispanic.[33] The

---

[32] In fact, the questionnaires showing self-reported ethnicity, produced after the trial, show that juror 494 is not Hispanic.

[33] Again, as shown by the questionnaires produced after the trial, the juror referenced (juror 124) actually is Hispanic.

44

reason for excusing him is he's a Dade County juror clerk. And we did not want somebody who's part of the jury selection process on the jury. But he is not Hispanic, Your Honor. Mr. Black again is speculating and being wrong.

MR. BLACK: I don't [know] how we can say he is not.

THE COURT: How can you say he is?

MR. BLACK: Looking at him. Let's get his name and find out. I think we need something on the record, but we object under Batson. They are using every challenge in a racially – racial characteristic, and it is improper. Ask him if he speaks Spanish.

THE COURT: He has given a reason for his exercise.

. . .

MR. BLACK: One other thing, we would request – since the government has made an issue of it, we would ask that the juror forms that are filled out by the five who were excused by the government be made part of the record because there will be a designation as to whether they are Hispanic or not. We would ask that those juror forms be collected by the clerk and if Your Honor wants to seal them and make them part of the record so that we can help make a record on that issue.

THE COURT: Okay.

45

MR. RYAN: Your Honor, the only response I want to make on the record is whether they are or they aren't really doesn't serve the question as we're sitting here, we don't really know whether they are or aren't unless someone were to raise their hand and tell us that.

THE COURT: ... we will make it part of the record and [the government] can argue that they didn't know because they didn't have those forms anyway.

After the juror and alternate slots were filled, Ochoa renewed his objection on the Batson issue:

MR. BLACK: ... I want to put on the record that juror 51 is an Hispanic man; 221, 234, Hispanic males; 378, Hispanic male; and 124 was an Hispanic male.

So five out of their six peremptory challenges as to the jury went to Hispanic males. One peremptory challenge did not....

[Also], I object to the makeup of the jury and move to strike. Dade County is 58 percent Hispanic. But the way it is now, I think there may be one.[34] So the government's plan to exclude all Hispanics from the jury has been very successful, and we add that to our Batson challenge....

---

[34]Actually, the questionnaires ultimately produced show that the jury contained six Hispanics, four jurors and two alternates. Thus, the defense counsel's ethnicity guesses, during the Batson objection, were inaccurate as well.

THE COURT: I don't know how you arrive at the determination of what the ethnic makeup of the jury is.

MR. BLACK: By looking at them.

THE COURT: I don't know that you can look at people and tell where they are from.

MR. BLACK: Then I would ask the Court to ask them.

THE COURT: I don't know that that's my burden.

MR. BLACK: Then I would ask permission to ask them.

THE COURT: But I don't think you have made – you have made what is an unsupported allegation. You are the one making it, not me.

MR. BLACK: But Your Honor does not allow us to have a questionnaire, to ask the questions, so I have to go with what I can. All I can do is see and listen.

THE COURT: What is it that – what power do you have? I would like to have that, look at people and know.

MR. BLACK: I will tell you exactly. I have lived in Dade County for well over 40 years. I can tell by the accents of their voices. We listened to people speaking, so we could tell which were Hispanic and which weren't. We can

47

look at what their facial features are and their skin color. And it is pretty obvious to me that the judgments that they made are correct.

We have eight African Americans. That's pretty obvious to make a judgment on. And I would ask if the Court has any question, let's put on the record and have the people state whether they are African American, white American, Hispanic.

THE COURT: Well, I'm not sure that by looking at them that would pass the [Daubert] test. I mean.

MR. BLACK: I would be shocked if my client's Constitutional rights could be so easily disregarded.

MR. DEL TORO: The prosecution team has not been able to determine[] the ethic background of the juror who is a photographer because he did not have any kind of an accent, spoke standard English, didn't appear clearly to be Hispanic.

I have noticed two of the jurors impaneled as alternates or as jurors in this case do have Spanish accents, and they are both males.[35]

---

[35]In fact, six Hispanics were impaneled as alternates or jurors. And one of the two jurors the prosecutors had identified as Hispanic (juror 494) was not actually Hispanic.

Of course, the government is not excluding male Hispanics from this jury....

MR. BLACK: I'm glad the government agreed that you could tell the Hispanic accent, so the government has joined me.

MR. DEL TORO: I said the only one – I could tell the two on the panel, the opposite of the Batson challenge, did not have discernible accents. He spoke standard American English.

MR. RYAN: If I could interrupt? This morning Mr. Black asked that the jurors stricken by the government, that their records be preserved. I would ask that all the jurors' records be preserved. I think it supports us.

THE COURT: All right.

MR. BLACK: I support that.

THE COURT: Do I need to say denied?

MR. BLACK: Yes. Thank you.

THE COURT: Thank you.

Thus, the district court found that Ochoa could not establish a prima facie case of discrimination because no one could ascertain which anonymous venire members

in this trial were Hispanic.[36]  If the government could not determine the ethnicity of the potential jurors in the venire, then it could not improperly strike them on that basis.  We therefore cannot say that the district court's findings on the Batson issue are clearly erroneous.

Neither is the dissent in a position to fact-find to the contrary here, see infra at 82 ("I am also unconvinced by the government's argument that it could not have violated Batson because it did not know the ... ethnicity of the prospective jurors at the time it exercised its peremptory strikes").  This is a circumstance where the district court is in a better position than this Court to make the factual determination. Cf. U.S. v. James, 113 F.3d 721, 729 (7th Cir. 1997) (district court was in a better position than appellate court to judge a juror's expression as a basis for a peremptory challenge).

---

[36]The dissent suggests that the district court made no discernible findings on the Batson issues.  See infra at 76 n. 14.  However, each of the district court's comments reflect its opinion that in this case one could not determine whether the particular stricken jurors were Hispanic (e.g., "How do you know they were Hispanic?" / "I have no way of knowing if that's what they were" / "How can you say he is [Hispanic]?" / "we will make [the juror forms] part of the record and [the prosecutors] can argue that they didn't know because they didn't have those forms anyway" / "I don't know how you arrive at the determination of what the ethnic makeup of the jury is" / "I don't know that you can look at people and tell where they are from" / "you have made what is an unsupported allegation" / "What is it that – what power do you have?  I would like to have that, look at people and know" / "Well, I'm not sure that by looking at them that would pass the [Daubert] test").  We think it reasonable to construe that as the district judge's basis for denying Ochoa's "pattern" challenge under Batson.

50

While the district court might have benefitted from knowing the exact number of Hispanic jurors that the government dismissed (whether the government knew it or not), it could observe first-hand whether visible judgments could be made about each juror's ethnicity in the venire. Conversely, we have no way of knowing whether the government could tell whether the jurors it struck were Hispanics. The only evidence available to this Court are the district court's observations of the venire in the record and the prosecutors' attempts to identify specific jurors as being Hispanic after Ochoa objected. And those post-objection judgments were incorrect. While Ochoa's attorney did correctly determine at trial that the five struck jurors were Hispanic, he himself at trial misidentified five other Hispanic jurors when he indicated that the jury contained only one Hispanic juror. In fact, six Hispanics were empaneled as jurors or alternates. We must therefore defer to the district court's finding of fact that one could not identify Hispanic jurors in this particular case simply by their appearance and accent.

The better practice in an anonymous-jury case would certainly be to disclose to the parties, upon request, the self-reported race and ethnicity of the venire members (without their names) so that the appropriate record for Batson could be made during the jury selection process. As the record in this case reveals, the only alternative to identifying the self-reported race or ethnicity of the venire members is to establish it

51

based on appearance, demeanor, accent, and other physical characteristics – thereby emphasizing racial distinctions in jury selection, which our <u>Batson</u> jurisprudence seeks to eliminate.[37]

### 3. Ochoa's Failure to State a Prima Facie Case

Even if we adopted the dissent's unsupported view that the government <u>could</u> determine the ethnicity of potential jurors, we would still reach the same result here because, as a matter of law, Ochoa failed to establish a prima facie case under <u>Batson</u>. In that regard, we note that the district court denied his challenge without determining whether there was a sufficient "pattern" of strikes by the government to create an

---

[37]We do not disagree with the dissent "that peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate," that a party could make "subjective" judgments or even stereotyped guesses about the race or ethnicity of a particular juror without having access to the juror's self-reported race or ethnicity, and that a party who decided to make such subjective judgments or guesses about race and ethnicity and then strike a juror due to that juror's perceived race or ethnicity would violate <u>Batson</u>. Dissent, *infra* at 78 n. 15 (internal quotes and cite omitted). Thus, we also agree with the dissent that "[l]itigants do not need to know the *self-reported* race or ethnicity of a juror to violate <u>Batson</u>." *Id.* at 82 (emphasis added). But that is not the dispute in this case.

Rather, the dispute here is over whether the district court's finding as to Ochoa's <u>Batson</u> claim was clearly erroneous. A fair reading of the transcript and the district court's comments reveals the district judge finding that, without the names and self-reported identity, one could not reliably determine a juror's race or ethnicity merely by looking at this venire. And the numerous mis-identifications by the parties seems to confirm that finding.

Finally, although the better practice would have been to give both parties the self-reported race or ethnicity upon request in order to avoid any speculative stereotyping by those with a mind to discriminate, we recognize that some may say that the district court's not doing so actually has the potential to reduce impermissible discrimination because the parties will not know objectively, will not be able to tell even subjectively without any reliability, and thus will not be able to use ethnicity as a factor in jury selection.

inference of discrimination. But the record on appeal contains the necessary statistical information for a thorough prima-facie-case analysis, which we will now undertake.[38]

In order to determine whether a Batson objector like Ochoa has established a prima facie case of discrimination, courts must consider all relevant circumstances. Batson, 476 U.S. at 96-97, 106 S.Ct. at 1723; Novaton, 271 F.3d at 1002; Lowder, 236 F.3d at 636. This Court has cautioned that "the mere fact of striking a juror or a set of jurors of a particular race does not necessarily create an inference of racial

---

[38]We acknowledge that district courts usually make the prima-facie-case determination under Batson's first prong. Yet, that is not necessary if, as a matter of law, the defendant's evidence on the Batson issue is insufficient to show a prima facie case. U.S. v. Allison, 908 F.2d 1531, 1537 (11th Cir. 1990); U.S. v. Dennis, 804 F.2d 1208, 1210-11 n.22 (11th Cir. 1986); King, 196 F.3d at 1334.

For example, in Allison we concluded that a remand was unnecessary where the government used three of its six peremptory strikes against black venire members and three black jurors (including one alternate) ultimately served. 908 F.2d at 1537. We concluded that the district court could not, as a matter of law, find that a prima facie case had been established because: (1) three black jurors served; (2) 15% of the venire was black and 21% of the jurors were black; and (3) the prosecutor struck three black jurors but also struck two white jurors. Id. at 1538; see also Dennis, 804 F.2d at 1210-11 (declining to remand in absence of prima-facie-case determination where the government only used 3 of its 6 peremptory challenges (2 of those 3 against black jurors) in selecting the first 12 jurors and only 1 of 2 alternate-juror challenges against a black juror, and accepted 2 black jurors who served on the jury).

As in King, Allison, and Dennis, we conclude that no remand is necessary in this case because Ochoa's statistical evidence fails to establish a "pattern" and thus a prima facie case of discrimination as a matter of law. As noted above, after the trial the district court made the juror questionnaires part of the record, thereby providing the self-reported race and ethnicity of each venire member. Further, the parties do not dispute who was on the venire, who was struck, and who served. Thus, the statistics are undisputed in this case.

discrimination." Lowder, 236 F.3d at 636; Novaton, 271 F.3d at 1002. While statistical evidence may support an inference of discrimination, it can do so "only" when placed "in context." Lowder, 236 F.3d at 638; Allen-Brown, 243 F.3d at 1298. For example, "the number of persons struck takes on meaning only when coupled with other information such as the racial composition of the venire, the race of others struck, or the voir dire answers of those who were struck compared to the answers of those who were not struck." Lowder, 236 F.3d at 636-37 (emphasis in original); see also Novaton, 271 F.3d at 1002 (same); Allen-Brown, 243 F.3d at 1298 (evaluating the strike pattern in light of the racial composition of remaining potential jurors); Stewart, 65 F.3d at 925 (stating that "no particular number of strikes against blacks automatically indicates the existence of a prima facie case," and considering, inter alia, the number of struck black jurors as a percentage of the black venire members).

In determining whether the totality of the circumstances shows a "pattern" that creates an inference of discrimination, this Court has considered a number of factors. First, whether members of the relevant racial or ethnic group served unchallenged on the jury. See Lowder, 236 F.3d at 638 ("[T]he unchallenged presence of jurors of a particular race on a jury substantially weakens the basis for a prima facie case of discrimination in the peremptory striking of jurors of that race."); Novaton, 271 F.3d at 1002, 1004 (same); King, 196 F.3d at 1335 (finding that "not only was there no

54

pattern of discriminatory strikes, there was a sort of 'antipattern'" where the State accepted one black juror and then struck the second of three black venire members); U.S. v. Puentes, 50 F.3d 1567, 1578 (11th Cir. 1995) ("Although the presence of African-American jurors does not dispose of an allegation of race-based peremptory challenges, it is a significant factor tending to prove the paucity of the claim."); Cochran v. Herring, 43 F.3d 1404, 1412 (11th Cir. 1995) (same); Stewart, 65 F.3d at 926 (same).

Similarly, we have considered whether the striker struck all of the relevant racial or ethnic group from the venire, or at least as many as the striker had strikes. See Lowder, 236 F.3d at 637 ("[T]he number of jurors of one race struck by the challenged party may be sufficient by itself to establish a prima facie case where a party strikes all or nearly all of the members of one race on a venire" (citing U.S. v. Williams, 936 F.2d 1243, 1246 (11th Cir. 1991)); cf. Dennis, 804 F.2d at 1210-11 (affirming finding of no prima facie case where the government did not use all of its strikes and thus "did not attempt to exclude all blacks, or as many blacks as it could, from the jury"); Allison, 908 F.2d at 1537 (same, where "the prosecutor preserved three black jurors, even though he had enough peremptory challenges to strike all the black jurors").

Second, we have considered whether there is a substantial disparity between the percentage of jurors of a particular race or ethnicity struck and the percentage of their representation on the venire. Lowder, 236 F.3d at 637. For example, in Lowder, we concluded that there was no prima facie case of discrimination where the plaintiffs used both of their peremptory strikes against white jurors. In so holding, we stated that there was no significant disparity between the plaintiffs' 100% rate of challenging white jurors and the 80% representation of white jurors on the venire. Id. On the other hand, in Stewart, we upheld a finding of a prima facie case based in part on the fact that, in exercising three peremptory challenges against black jurors, the defense struck 75% of black venire members. 65 F.3d at 925.

Third, this Court has considered "whether there is a substantial disparity between the percentage of jurors of one race [or ethnicity] struck and the percentage

of their representation on the jury."[39]  Lowder, 236 F.3d at 637; Novaton, 271 F.3d

at 1002.

Applying these three factors here leads to the conclusion that the totality of the

circumstances does not reveal a "pattern" of discrimination.[40]  Here 44 of the 82

venire members (54%) identified themselves as Hispanic.  The government used five

of its nine peremptory strikes (56%) against Hispanic jurors.[41]  Ochoa used seven of

---

[39]The factors discussed here do not constitute an exhaustive list of potentially relevant factors in determining whether an inference of discrimination arises.  Rather, the heart of Ochoa's argument seems to be that the statistical evidence creates a "pattern" of discrimination, and thus we focus on the factors relevant to establishing such a pattern.  However, in other cases, other factors may be relevant.

For example, the court may consider "the voir dire answers of those who were struck compared to the answers of those who were not struck."  Lowder, 236 F.3d at 637.  In some Batson claims, the subject matter of the case may be relevant if it is racially or ethnically sensitive.  For example, in Stewart, the defense used its peremptory challenges to strike 3 of the 4 potential black jurors, causing the jury to have only one black member.  65 F.3d at 925.  The district court found a prima facie case of race discrimination and this Court affirmed.  Id.  This Court noted that "no particular number of strikes against blacks automatically indicates the existence of a prima facie case," but it concluded that a prima facie case existed in part because the defendants were being prosecuted for a racially motivated hate crime against blacks.  Id.  In contrast, there is no contention that the subject matter in Ochoa's case is relevant.

[40]Here, the district court did ask the government for explanations of two of the five struck jurors. Our precedent requires, however, that we answer the prima facie question first and affirm the district court's ruling if no prima facie case was established.  See Lowder, 236 F.3d at 636.  If Ochoa's evidence establishes a prima facie case, then we would need to remand to the district court for further Batson proceedings, including a statement of the reasons by the government for all five of its peremptory strikes.

[41]In determining whether a statistical pattern of discrimination exists, our precedent looks to the total number of peremptory strikes available to the striker, including the peremptory strikes against alternates.  See, e.g., Allison, 908 F.2d at 1538; Dennis, 804 F.2d at 1210-11.  While this trial lasted approximately three weeks, the record is not clear whether any alternates ultimately participated in the final verdict.

57

his thirteen peremptory strikes (54%) against Hispanic jurors. Six of the seventeen jurors or alternates (35%) were Hispanic.[42]

The district court allotted the government six strikes for the selection of the twelve jurors and three strikes for the selection of five alternate jurors, for a total of nine strikes. The government used five of its six strikes against Hispanics in selecting the first twelve jurors and used none of its three strikes against Hispanics in alternate selection. The defense used five of its ten strikes against Hispanics in selecting the jury panel and two of its three strikes against Hispanics in selecting alternate jurors.

The government's strikes occurred in this manner. After accepting a Hispanic (No. 399),[43] it used its first strike against a Hispanic juror (No. 051). The government then accepted another Hispanic (No. 232) who served on the jury, before striking a second Hispanic (No. 221). It then accepted a third Hispanic who was subsequently struck by the defense (No. 146). The government then used its third and fourth strikes against Hispanic jurors (No. 234 and 379).[44] Its fifth and sixth strikes were

_____

[42]Four of the twelve jurors and two of the five alternates were Hispanic. When all juror and alternate slots were filled, twelve unseated venire members remained, including five Hispanics (approximately 42%). They were not reached in the peremptory-striking process.

[43]Juror 399 was later removed for cause.

[44] The dissent focuses largely on the status of the striking at the time of the government's fourth strike, when Ochoa's counsel first raised the Batson claim. Even assuming that at that moment the government could tell who was and who was not Hispanic, nevertheless it had already accepted three Hispanic jurors. And of those three, two had already been seated by the time the government exercised its fourth strike, while the defense struck the third. Plus, half of this venire was Hispanic

then used against a non-Hispanic (No. 009) and a Hispanic juror (No. 124), respectively. After the government exhausted its strikes, seven more jurors were placed on the jury, including two more Hispanics (No. 447 and 246).

Then, during the selection of alternates the government used each of its three strikes against non-Hispanic jurors, while accepting (1) one Hispanic (No. 511) who was subsequently struck by the defense; (2) one Hispanic (No. 420) whom the court struck or cause; and (3) one Hispanic (No. 620) who served as an alternate. After the government exhausted its alternate strikes, two more Hispanics were made alternates (No. 568 and 583), one of whom ultimately served on the jury.[45]

Nothing in these statistics suggests that the government employed a "pattern" of discrimination. Rather, the government's jury-selection choices reflect a sort of "anti-pattern." See King, 196 F.3d at 1335. While the government struck five Hispanics, it also accepted at least six Hispanics along the way.[46] Thus, as to the first

to begin with, so it was not unusual that three Hispanics were already accepted and four were already struck. Thus, the fourth strike, viewed against those factual circumstances, creates no prima facie case under Batson.

We agree with the dissent that the striking of even one juror for a racial or ethnic reason may violate *Batson*. We simply disagree that a prima facie case was established at the time of the government's fourth peremptory strike.

[45]Juror 568 was later moved onto the jury in place of juror 399.

[46]Jurors 399, 232, 146, 511, 420 and 620. The jury numbering system employed by the district court makes it difficult to determine from the jury-selection transcript if the jurors struck by the defense were first offered and accepted by the government. The transcript suggests that most of the time the

statistical factor discussed above, the unchallenged presence of six Hispanic jurors and the government's "anti-pattern" striking manner vitiates Ochoa's Batson claim.

Concerning the second factor, the government's strike rate against Hispanics was proportional to the composition of the venire. The venire was 54% Hispanic, and the government used 56% of its peremptory strikes against Hispanics. This factor also undercuts Ochoa's claim.

As to the third factor, we recognize that the percentage of Hispanics who ultimately served on the jury (35%) was lower than the percentage of Hispanics in the venire (54%). That result, however, was dictated by the district court's 21 for-cause strikes against Hispanics more so than the government's five strikes against Hispanics. Further, the defense used seven of its thirteen peremptory challenges against Hispanics. Given that the government struck only five of the 44 Hispanics on the venire and the district court and Ochoa together struck 28 of the 44, the 35% factor was not the result of the government's striking pattern.[47]

---

defense went first and struck before the government. However, in at least two instances, Hispanic jurors (nos. 146 and 511) were accepted by the government before being struck by the defense.

[47]In Bui v. Haley, 321 F.3d 1304 (11th Cir. 2003), this Court dismissed as irrelevant the fact that the defendant (the Batson objector) also had struck black jurors, stating: "the fact that [defendant] himself may have unclean hands can have no bearing on our determination of whether the State's use of its strikes to remove blacks from the jury passes constitutional muster." Id. at 1318 n.19. While there is no such "unclean hands" defense to bar Ochoa's Batson claim, the number of strikes by the objecting party can be used to establish how the racial or ethnic makeup of the final jury was formed. See Novation, 271 F.3d at 1004 (noting the district court was free to consider all "relevant circumstances," including "that the [Batson challengers] themselves exercised peremptory challenges

Each factor suggests that the government's five peremptory challenges against Hispanics, viewed in context, do not reveal a "pattern" of discrimination. We thus conclude that Ochoa's <u>Batson</u> claim lacks merit as a matter of law, and a remand on that issue is unnecessary.

Ochoa's remaining claims are also without merit. Accordingly, in <u>Ochoa-Vasquez</u> we AFFIRM Ochoa's conviction and sentence. We REVERSE the orders denying Ochoa access to sealed records in that case and REMAND them for reconsideration in light of the above. In <u>Bergonzoli</u>, we AFFIRM the order striking Ochoa's motion to unseal records.

---

to strike Hispanic jurors"). Otherwise, the alleged <u>Batson</u> violator would essentially be held responsible for the strikes made by the objecting party.

BARKETT, Circuit Judge, concurring in part and dissenting in part:

Other than the First Amendment[1] and jury issues, I agree that Ochoa's arguments would not warrant reversal. However, because the jury selection in this case was so deficient in due process, I believe Ochoa should be granted a new trial. Specifically, I think that after empaneling an anonymous jury, the district court inexplicably failed to take the simple precautionary measures that would have been adequate to protect Ochoa's presumption of innocence or his right to an impartial jury as required by United States v. Ross, 33 F.3d 1507, 1520 (11th Cir. 1994). Additionally, I believe the jury selection process violated the dictates of Batson v. Kentucky, 476 U.S. 79 (1986) and Johnson v California, 125 S. Ct 2410 (2005).

## 1. Anonymous Jury

Recognizing that jury anonymity "is a drastic measure . . . which should be undertaken only in limited and carefully delineated circumstances," the guidelines in

---

[1] Additionally, although I certainly agree with the propriety of using our supervisory powers to remind the district court that it must comply with the dictates of United States v. Valenti, 987 F.2d 708 (11th Cir. 1993), I also think that the constitutionality of its docketing procedures was properly before us as an issue on appeal. The majority notes that " [b]ecause the district court's orders unsealing dockets here brought them in compliance with Valenti, the secret-docketing issue is not properly before us." Majority Op. at 20. However, this is precisely the procedural posture in Valenti, in which the district court had used unconstitutional secret docketing procedures, but entered an order prior to the appeal requiring the clerk "to annotate any further closed proceedings in this case on the Middle District's public docket . . . ." Valenti, 987 F.2d at 711. The Valenti Court recognized that this order "moot[ed] that portion of this case relating to the district court's procedures for closure and its maintenance of a dual-docketing system," but nonetheless heard the claim on its merits because it "present[ed] a controversy capable of repetition yet evading review." Id. at 712.

Ross limit the circumstances in which a court can empanel an anonymous jury. Ross, 33 F.3d at 1519. These guidelines contemplate that a court must do more than it ordinarily would to protect a defendant's presumption of innocence and right to an impartial jury by "taking reasonable precautions to minimize any prejudicial effects on the defendant . . . ." Id. at 1520 (emphasis added). The majority opinion concludes that the voir dire in this case, which made no mention or inquiry regarding either the jury anonymity or the unusual security measures taken, together with the standard jury instructions, was sufficient to meet the "reasonable precautions" requirement. I disagree. The voir dire and jury instructions under the circumstances presented here, even in combination, fall short of the requirements of Ross, and the majority opinion eviscerates the protective measures that Ross requires in order to address the grave concerns posed by any extraordinary measures such as additional security and juror anonymity.

There is no question that, in the context of an anonymous jury, voir dire protects a defendant's presumption of innocence as well as his right to an impartial jury. Id at 1520. By drawing a rigid distinction between the two concerns raised by jury anonymity – the risk that it will impinge upon a defendant's Sixth Amendment right to an impartial jury by inhibiting the meaningful exercise of peremptory challenges and the risk that it will damage a defendant's presumption of innocence

by "rais[ing] the specter that the defendant is a dangerous person from whom the jurors must be protected," id. at 1519 – the majority opinion finds that the requirements of Ross have been satisfied in this case. This conclusion rests on the untenable premise that voir dire is "not . . . a means of investigating the potential effect of anonymity on the jurors' ability to presume the defendant innocent." Majority Op. at 35. In fact, a measure that threatens a defendant's right to a presumption of innocence also necessarily threatens his right to an impartial jury. If jury anonymity has instilled in jurors the perception that a defendant is dangerous – thereby affecting his presumption of innocence – it has also affected his right to an impartial jury. Thus, to the degree that voir dire is the appropriate way to uncover juror bias, it is necessarily the appropriate way to uncover bias that arises from juror anonymity itself. Both the cautionary instruction and the thorough voir dire discussed in Ross must therefore be understood to safeguard both the presumption of innocence and the right to an impartial jury.

In a case like this, where the defendant may have waived a cautionary instruction,[2] voir dire becomes exceptionally important, as it is the primary means of

---

[2] Ochoa's adamant argument against a cautionary instruction did not occur at trial, but rather in the context of his opposition to the government's motion to empanel an anonymous jury, when he contended that any precautionary measures the court might take would be ineffective. (D.E. 982.) Nonetheless, he did not request a cautionary instruction at any point during trial proceedings.

safeguarding both of these rights. When we held in United States v. Bowman, 302 F.3d 1228 (11th Cir. 2002), that a defendant waives any right to a cautionary instruction by failing to request one, we took care to note that voir dire had been "thorough," and as a result, "the parties knew everything about the jurors except their names." Id. at 1236 n.1.

In other cases where defendants have failed to ask for a cautionary instruction, courts, while denying relief, have emphasized that voir dire counteracted the lack of an explanatory instruction to anonymous jurors. In United States v. Vario, 943 F.2d 236 (2d Cir. 1991), the Second Circuit held that the defendant had waived his right to an explanatory jury instruction by failing to request one. Id. at 241. Nonetheless, the Second Circuit held that the district court had adequately protected the defendant's rights by "fully instruct[ing] the jurors on the presumption of innocence" and "conduct[ing] a searching voir dire which sufficiently enabled [the defendant] to exercise his challenges meaningfully and to obtain a fair and impartial jury." Id. at 241-42.

In United States v. Mansoori, 304 F.3d 635 (7th Cir. 2002), the Seventh Circuit found that a defendant's rights were adequately protected even though the court provided no explanation for jurors' anonymity, because the court "conducted an

extremely thorough voir dire . . . over the course of three and one-half days"[3] and

emphasized the presumption of innocence and the government's burden of proof in

its instructions.  Id. at 652.  The court specifically noted that "[t]he defendants have

identified no aspect in which the district court's voir dire was wanting . . . ."  Id.

Here, however, Ochoa did identify an "aspect in which the district court's voir

dire was wanting" and tried to address it.  He expressly sought to determine whether

the extreme security precautions, including the anonymity of the jurors, impaired any

juror's ability to be neutral.  However, the district court did not permit either defense

lawyers or the government to ask questions on this topic.  Nor would the trial court

include these topics in its own voir dire questions.  I believe this violated both

Ochoa's Sixth Amendment and due process rights.  Even though "[t]he Constitution

. . . does not dictate a catechism for voir dire," Morgan v. Illinois, 504 U.S. 719, 729

(1992), a court can abuse its discretion by failing to question prospective jurors on

certain relevant topics.  For example, the Constitution requires voir dire on topics of

racial prejudice, attitudes toward the death penalty, and exposure to pre-trial publicity

when those issues are relevant to the trial.  See Ham v. South Carolina, 409 U.S. 524,

527 (1973) (holding that "the essential fairness required by the Due Process Clause

of the Fourteenth Amendment requires that . . . the petitioner be permitted to have the

---

[3] In this case, by contrast, the entire voir dire was completed in less than one day.

66

jurors interrogated on the issue of racial bias" where the defendant was African-American and alleged that his arresting officers had framed him in retaliation for his civil rights activities); Morgan, 504 U.S. at 735-36 (holding that a defendant facing the death penalty must be allowed to question jurors to determine whether any would automatically impose the death penalty if the defendant were found guilty); Jordan v. Lippman, 763 F.2d 1265, 1281-82 (11th Cir. 1985) (holding that the Sixth and Fourteenth Amendments required voir dire to determine whether jurors had been exposed to extensive pre-trial publicity when a controversial protest directly relating to the trial took place the weekend before trial).

The same reasoning that requires voir dire to reveal juror bias in these situations also requires voir dire to uncover bias caused by jury anonymity, as jury anonymity is also recognized to pose a significant threat to a defendant's presumption of innocence and right to an impartial jury. See Ross, 33 F.3d at 1519-20; United States v. Amuso, 21 F.3d 1251, 1264 (2d Cir. 1994) ("In deciding whether the district court properly granted a sequestered and anonymous jury, we must balance the defendant's interest in conducting meaningful voir dire and in maintaining the presumption of innocence, against the jury member's interest in remaining free from real or threatened violence and the public interest in having the jury render a fair and impartial verdict."). In our cases addressing pre-trial publicity, we have explicitly

outlined a minimum scope of voir dire required to protect the defendant's right to an impartial jury. Those guidelines apply equally to the circumstance of an anonymous jury. In United States v. Davis, 583 F.2d 190 (5th Cir. 1978),[4] which arose out of an armed attempt to free Americans detained in a Mexican jail on drug charges, the district court determined that all of the potential jurors had heard about the highly-publicized facts of the case. Id. at 196. During voir dire, the court asked the panel as a whole "if [they] felt the publicity impaired [their] ability to render an impartial decision." Id. No one responded, and the court rejected defense counsel's request for individual questioning on the subject. Id. The former Fifth Circuit found that this constituted an abuse of discretion:

> Under the circumstances of this case, where the nature of the publicity as a whole raised a significant possibility of prejudice, the cursory questioning by the court was not enough. The court should have determined what in particular each juror had heard or read and how it affected his attitude toward the trial, and should have determined for itself whether any juror's impartiality had been destroyed.

Id. (emphasis added).

In Jordan, a controversial demonstration directly relating to the case took place near the courthouse and received extensive media coverage. 763 F.2d at 1270-71.

---

[4] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

After the demonstration, defense counsel sought "additional and individualized voir dire to enable him to uncover any prejudice which may have resulted from the events," but the district court refused. Id. at 1271. Relying on Davis, we found that "[a]t the least, there was a 'significant possibility of prejudice' which arose from the coverage of the protest and the protest itself when coupled with all that had come before it." Id. at 1279. In addition, we found that "[t]he voir dire engaged in after the events of the weekend . . . was not merely inadequate, it was nonexistent." Id. at 1281. We concluded that the voir dire was insufficient to protect Jordan's rights because the jurors "were subject to a significant possibility of prejudice while … Jordan was not given an opportunity to uncover such prejudice." Id. at 1281-82. We held that at a minimum, "where there exists a significant possibility of prejudice the jurors must in the first instance be questioned as to whether they were exposed. Further inquiry as to the nature of the exposure is then undertaken, if necessary." Id. at 1281.[5]

The empanelment of an anonymous jury and the use of extraordinary security measures pose the same significant possibility of juror prejudice as racial prejudice, attitudes toward the death penalty, and exposure to pre-trial publicity.

---

[5] Moreover, Jordan made it clear that the voir dire requirements set out in Davis and Jordan were derived from constitutional requirements, and not based on our supervisory powers. See Jordan, 763 F.2d at 1278 & n.15.

Thus, I believe that a similar constitutional requirement for specific voir dire also applies in the context of anonymous juries. Under <u>Ross</u>, at a minimum, the court should have granted Ochoa's request that the jurors be questioned regarding their response to the security measures so that counsel could make an informed decision as to their bias.[6]

## 2. Batson Challenge

I also disagree with the majority that Ochoa's claim that the prosecution's use of its peremptory strikes violated <u>Batson</u>, 476 U.S. at 79, "lacks merit as a matter of law." Majority Op. at 61.

Ochoa's <u>Batson</u> claim rested on allegations that the prosecution engaged in a discriminatory "pattern" of strikes against five Hispanic venire members.[7] The prosecution offered a non-discriminatory basis for two of the strikes, but insisted that

---

[6] There is no support for the majority's proposal that the "generally accepted practice" is to "downplay … the significance of the juror anonymity procedure." Majority Op. at 36. While I acknowledge that at some point emphasis on jury anonymity, particularly in the form of a cautionary instruction, may itself create problems of prejudice, the type of safeguards <u>Ross</u> proposes – the cautionary instruction and thorough voir dire – suggest that the court must do more than it would in the course of an ordinary trial to address the particular hazards presented by jury anonymity.

Furthermore, the majority notes that the district court "instruct[ed] the jury repeatedly and at length about the presumption of innocence," majority op. n.28, but there is nothing in this record that distinguishes these jury instructions, either in length, time, or frequency, from those generally given at the beginning and end of every criminal trial. Thus, I do not believe that such instructions satisfy <u>Ross</u>'s requirement that a court do more than is ordinarily required to protect a defendant's presumption of innocence under the circumstances present here.

[7] Specifically, Ochoa challenged the strikes of jurors 51, 221, 234, 379, and 124. (D.E. 1468, 85.)

Ochoa could not establish a <u>prima facie</u> case of discrimination because the anonymity of the jurors precluded a conclusive determination of their ethnicity.[8] Identifying the Hispanics on the venire, the government argued, was a necessary prerequisite to discriminating against them. However, the trial court refused to disclose the racial and ethnic information the venire members had reported on a jury questionnaire prior to voir dire.[9] Ochoa's counsel asserted that, nonetheless, both he and the prosecution could tell which jurors were Hispanic from their appearance and voices. Indeed, although the prosecution vigorously denied that it could discern the ethnicity of the stricken jurors, it stated at voir dire that it "noticed two of the jurors impaneled as alternates or as jurors in this case do have Spanish accents," and that a juror it had

---

[8] I have used "ethnicity" or "ethnic identity" to describe a juror's Hispanic origin wherever possible, but in some instances the case law refers to a juror's Hispanic "race." However, the Supreme Court appears to use "race" and "ethnicity" interchangeably in the <u>Batson</u> context, at least when discrimination against jurors of Hispanic or Latino origin is at issue. <u>See</u> <u>United States v. Martinez-Salazar</u>, 528 U.S. 304, 315 (2000) ("Under the Equal Protection Clause, a defendant may not exercise a peremptory challenge to remove a potential juror solely on the basis of the juror's gender, ethnic origin, or race."). <u>Compare</u> <u>Hernandez v. New York</u>, 500 U.S. 352, 355 (1991) (plurality opinion) (stating that a <u>Batson</u> violation would occur if "the prosecutor in [the petitioner's] criminal trial exercised peremptory challenges to exclude Latinos from the jury by reason of their ethnicity"), <u>with</u> <u>id.</u> at 372 (O'Connor, J., concurring in the judgment) ("In order to demonstrate [a <u>Batson</u>] violation, Hernandez must prove that the prosecutor intentionally discriminated against Hispanic jurors on the basis of their race.").

[9] The district court made no findings with respect to these explanations, other than to acknowledge that they had been offered, nor did it indicate whether it believed the government's argument that it could not tell if the stricken jurors were Hispanic.

accepted "appears to talk with an accident [sic] that would indicate a Hispanic background." Thus, it could discern that some jurors were Hispanic.

Despite the defense's assertion and the prosecution's admissions that Hispanic jurors could be, and had been, identified by sight and sound, the district court refused to consult the completed jury questionnaires or ask the stricken jurors to identify their ethnicity on the record to determine whether Ochoa had established a prima facie case of discrimination. Instead, without permitting counsel to conclusively establish the ethnicity of the jurors, and without making any factual determinations in that regard, the trial court orally ruled that Ochoa had failed to make out a prima facie Batson claim:

| THE COURT: | I don't know how you arrive at the determination of what the ethnic makeup of the jury is. |
| MR. BLACK:[10] | By looking at them. |
| THE COURT: | I don't know that you can look at people and tell where they are from. |
| MR. BLACK: | Then I would ask the Court to ask them. |
| THE COURT: | I don't know that that's my burden. |
| MR. BLACK: | Then I would ask permission to ask them. |

---

[10] Ochoa's counsel.

72

THE COURT:          But I don't think you have made -- you have made what is an unsupported allegation. You are the one making it, not me.

MR. BLACK:          But Your Honor does not allow us to have a questionnaire, to ask the questions, so I have to go with what I can. All I can do is see and listen.

THE COURT:          What is it that - - what power do you have? I would like to have that, look at people and know.

MR. BLACK:          I will tell you exactly. I have lived in Dade County for well over 40 years. I can tell by the accents of their voices. We listened to people speaking, so we could tell which were Hispanic and which weren't. We can look at what their facial features are and their skin color. And it is pretty obvious to me that the judgments that they made are correct.

                    We have eight African Americans. That's pretty obvious to make a judgment on. And I would ask if the Court has any question, let's put on the record and have the people state whether they are African American, white American, Hispanic.

MR. DEL TORO:[11]    The prosecution team has not been able to determined [sic] the ethic [sic] background of the juror who is a photographer [juror 379] because he did not have any kind of an

---

[11] Counsel for the government.

73

accent, spoke standard English, didn't appear clearly to be Hispanic.

I have noticed two of the jurors impaneled as alternates or as jurors in this case do have Spanish accents, and they are both males.

Of course the government is not excluding male Hispanics from this jury. The mere fact that someone manages to make it in doesn't have anything to do with the <u>Batson</u> challenge.

MR. BLACK:    I'm glad the government agreed that you could tell the Hispanic accent, so the government has joined me.

MR. DEL TORO:    I said the only one -- I could tell the two on the panel, the opposite of the <u>Batson</u> challenge, did not have discernable accents. He[12] spoke standard American English.

MR. RYAN:[13]    If I could interrupt? This morning Mr. Black asked that the jurors stricken by the government, that their records be preserved. I would ask that all the jurors' records be preserved. I think it supports us.

THE COURT:    All right.

MR. BLACK:    I support that.

THE COURT:    Do I need to say denied?

---

[12] Presumably juror 379.

[13] Counsel for the government.

MR. BLACK:          Yes.  Thank you.

THE COURT:         Thank you.

(D.E. 1468, 86-88.)

After trial, the district court supplemented the record with the racial and ethnic information from the jury questionnaires.  Rather than supporting the government this information, available at the time of voir dire, confirmed that all five of the allegedly Hispanic jurors stricken by the prosecution were in fact Hispanic.

Despite the "great deference" we give to the district court's finding as to the existence of a prima facie Batson case, "[t]he application of the equal protection principles enunciated in Batson to the exclusion of [a particular racial or ethnic group] from a jury is an issue of constitutional law that is subject to plenary review." United States v. Allen-Brown, 243 F.3d 1293, 1296 (11th Cir. 2001).  Indeed, as the Supreme Court has now twice reminded us, "deference does not by definition preclude relief." Miller-El v. Dretke, 125 S. Ct. 2317, 2325, (2005) (quoting Miller-El v. Cockrell, 537 U.S. 322, 340 (2003)) (internal marks omitted).[14]

---

[14] The majority correctly notes that "we give great deference to a district court's finding of whether a prima facie case of impermissible discrimination has been established," and cites our decision in Allen-Brown, 243 F.3d at 1296-97, for the proposition that "[a] district court's finding as to why a juror is excused is an issue of fact, and as such, it will not be disturbed on appeal unless it is clearly erroneous or appear to have been guided by improper principles of law."  This case, however, is one in which the district court was guided by "improper principles of law." By refusing to permit the defendant to put the pertinent facts relating to the juror's ethnicity on the record, the court misapplied the law of Batson.

75

To prove a <u>Batson</u> violation, the party challenging the use of peremptory strikes must "must make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." <u>Johnson</u>, 125 S. Ct. at 2416 (internal quotation marks omitted). The Supreme Court recently emphasized that the objecting party's burden in establishing a <u>prima facie</u> <u>Batson</u> case is one of <u>production</u> and not of persuasion. <u>Id.</u> at 2417-18 & n.7. It also made clear that although the burden of production requires the objecting party to produce facts supporting an inference of discrimination, that inference need not be the most likely one possible, or even one that is more likely than not correct, but instead need only be one conceivable inference among many:

> We did not intend [<u>Batson</u>'s] first step to be so onerous that a defendant would have to persuade the judge--on the basis of all the facts, some of which are impossible for the defendant to know with certainty--that the challenge was more likely than not the product of purposeful discrimination. Instead, a defendant satisfies the requirements of

Furthermore, the majority also notes that "[w]hile Ochoa's attorney did correctly determine at trial that the five struck jurors were Hispanic, he himself at trial misidentified five other Hispanic jurors when he indicated that the jury contained only one Hispanic juror. In fact, six Hispanics were empaneled as jurors or alternates. We must therefore defer to the district court's finding of fact that one could not identify Hispanic jurors in this particular case simply by their appearance and accent." This deference is not warranted, however, because it mischaracterizes what the court did as a fact-finding determination, when in fact the district court specifically avoided making such a determination. The record is devoid of any finding by the district court that one could not identify Hispanic jurors. Instead, the majority cobbles together comments which it construes as such a finding. <u>See</u> majority op. n.36.

> Batson's first step by producing evidence sufficient to permit the trial judge to draw <u>an</u> inference that discrimination has occurred.

<u>Id.</u> at 2417 (emphasis added) (internal quotation marks omitted).

As noted in the majority opinion, the Supreme Court in <u>Batson</u> enumerated two examples of circumstances that may support an inference of impermissible discrimination: (1) if a party engages in a "pattern" of strikes against venire members of a particular race, or (2) if a party makes statements or asks questions during voir dire or in exercising challenges suggesting that its strikes have a discriminatory purpose. <u>Batson</u>, 476 U.S. at 97; <u>Central Ala. Fair Housing Ctr. Inc. v. Lowder Realty Co.</u>, 236 F.3d 629, 636 (11th Cir. 2000). In cases where a <u>Batson</u> challenge only alleges an impermissible "pattern" of strikes against venire members of a particular race, a challenge rate significantly greater than the minority percentage of the venire strongly supports a <u>prima facie</u> <u>Batson</u> claim. <u>Central Ala. Fair Housing Ctr.</u>, 236 F.3d at 637 (citing <u>United States v. Alvarado</u>, 923 F.2d 253, 255 (2d Cir. 1991), in which the court held that a challenge rate 172% greater than the estimated minority percentage of the venire established a <u>prima facie</u> case of discrimination). In this case, Ochoa alleged that the prosecution had used 83.3% of its strikes – five of six – to eliminate Hispanics from the venire. A challenge rate of 83.3% strongly

supports a <u>prima facie</u> <u>Batson</u> claim in cases involving all but the most Hispanic-dominated venire panels.[15]

Accordingly, the merits of Ochoa's <u>prima facie</u> case rested on a statistical comparison of the percentage of strikes used to eliminate Hispanic jurors to the percentage of Hispanics on the venire.[16]  The burden of establishing facts sufficient

---

[15] In fact, the juror records indicate that of the 82-member venire, 44 (or approximately 52%) identified themselves as Hispanic.  (The Hispanic ethnicity of two black jurors is listed as "UNK," which I understand to represent "unknown."  I do not count these two jurors as Hispanic, but if one did include them, Hispanics would have composed about 56% of the venire.)  Thus, the challenge rate was slightly more than 154% of the minority percentage of the venire, a disparity significant enough to "strongly support" a <u>prima facie</u> <u>Batson</u> claim under <u>Central Alabama Fair Housing Center</u>, especially because the challenge rate in this case could not have exceeded 185% of the minority percentage of the venire.  Moreover, Ochoa was "entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate."  <u>Batson</u>, 476 U.S. at 96 (internal quotation marks omitted).

[16] The majority says that "[e]ven if we adopted the dissent's unsupported view that the government <u>could</u> determine the ethnicity of potential jurors, we would still reach the same result here because, as a matter of law, Ochoa failed to establish a prima facie case under <u>Batson</u>.  In that regard, we note that the district court denied his challenge without determining whether there was a sufficient "pattern" of strikes by the government to create an inference of discrimination.  But the record on appeal contains the necessary statistical information for a thorough prima-facie-case analysis, which we will now undertake." Majority Op. at 52-53.  As the majority recognizes, it is the district court's job in the first instance to make the prima facie case determination.  And the Supreme Court in <u>Johnson</u> clarified that "inferences that discrimination may have occurred [are] sufficient to establish a prima facie case under <u>Batson</u>." <u>Johnson</u>, 125 S. Ct. at 2419.  Here, Ochoa's statistical analysis clearly creates an inference of discrimination.  Indeed, the majority errs in how it conducts the <u>Batson</u> statistical analysis: it does not conduct the analysis at the time the objection was raised, but only after jury selection was completed.  At the time Ochoa first raised his <u>Batson</u> objection, the government had used four of its peremptory strikes, all of them against Hispanics. This 100% strike rate against Hispanics would seem to present a "substantial disparity between the percentage of jurors of one race struck and the percentage of their representation on the jury," which was 52% in this case. <u>Central Ala. Fair Housing Ctr.</u> 236 F.3d at 637.  And while our precedents point out that the making of a prima facie case cannot "ordinarily" rest on numbers alone, <u>id.</u> ("A party advancing a Batson argument ordinarily should "come forward with facts, not just numbers alone.""(citation

to support a prima facie case of discrimination rests on the moving party. Central

Ala. Fair Housing Ctr., 236 F.3d at 636.

However, the district court specifically blocked Ochoa from obtaining the

necessary ethnic information to support his potentially meritorious claim by: (1)

adopting juror anonymity measures that hid the ethnicity of the venire from the

litigants; (2) precluding Ochoa from accessing the jury questionnaires; and (3)

refusing to question the jurors directly about their ethnicity or to allow Ochoa to do

so — and thus made it impossible to conclusively resolve the merits of Ochoa's claim.

As important as juror anonymity measures may be, they cannot be permitted to

defeat jurors' and litigants' rights under the Equal Protection Clause, especially since

there can be no security risk in granting access to self-reported racial information to

litigants (if not to the public).[17] Without this basic information, a litigant could almost

never establish a prima facie case of racial discrimination based on a "pattern" of jury

strikes, since that showing will usually rest upon a statistical analysis of the venire's

omitted)), the district court's refusal to allow Ochoa to access information that would have allowed
him to make a Batson challenge is far from "ordinary."

[17] Indeed, I see no reason to keep racial information about anonymous jurors sealed at all. Ochoa's
Batson challenge could have been easily resolved but for the anonymity measures. Moreover, if the
litigants know the self-reported race or ethnicity of the jurors before voir dire, the district and
appellate courts will not be faced with the thorny question of whether the litigants could discern the
race of the jurors by observation alone. This is not an easy task in many cases, such as when a party
strikes so-called "light-skinned blacks" or "mulattos" from the venire. And if the court errs in its
racial assessment, it risks adding insult to the discriminatory injury the stricken jurors may already
have suffered.

racial composition. See Central Ala. Fair Housing Ctr., 236 F.3d at 636-37. And, as the record reveals, the only alternative to identifying the self-reported race or ethnicity of the venire members is to establish it based on appearance, demeanor, voice, and other physical characteristics – thereby perpetuating the same invidious stereotyping in jury selection that our Batson jurisprudence seeks to eliminate. See, e.g., J.E.B. v. Alabama ex. rel. T.B., 511 U.S. 127, 140 (1994) ("The community is harmed by the State's participation in the perpetuation of invidious group stereotypes and the inevitable loss of confidence in our judicial system that state-sanctioned discrimination in the courtroom engenders.").

In short, in order to evaluate the merits of Ochoa's Batson claim in light of the juror anonymity measures and restrictions on voir dire, and thereby comply with Central Alabama Fair Housing Center's mandate to "examine whether the [moving] party has shown sufficient 'relevant circumstances' to raise an inference that the opposing party seeks to exclude [] prospective juror[s] on account of race," 236 F.3d at 636, the district court had to permit Ochoa to identify which venire members were Hispanic and which were not. Yet that is exactly what the district court refused to do. Instead, it ruled that Ochoa could not make out a prima facie case because he could not produce the very ethnic information it had precluded him from obtaining. In so doing, I believe the district court misapplied "the equal protection principles

enunciated in <u>Batson</u>," <u>Allen-Brown</u>, 243 F.3d at 1296, and committed reversible error.

In addition, the district court's refusal to consult or release the jurors' self-reported racial information until after trial — information that it recognized was "crucial to [Ochoa's] <u>Batson</u> claim" (D.E. 1552, 1) — subjected the determination of whether Ochoa had made out a <u>prima facie</u> case to impermissible judicial speculation about the venire's racial makeup. See <u>Johnson</u>, 125 S. Ct. at 2418-19 (holding that it violated <u>Batson</u> for a state court to speculate about plausible race-neutral reasons for striking jurors in determining whether the defense had made out a <u>prima facie</u> case under <u>People v. Wheeler</u>, 583 P.2d 748 (Cal. 1978), and noting that "[t]he inherent uncertainty present in inquiries of discriminatory purpose counsels against engaging in needless and imperfect speculation when a direct answer can be obtained by asking a simple question"). Moreover, the district court's refusal to release the racial data during voir dire needlessly deferred any inquiry into the prosecution's motives to some later date, when the passage of time and impermissible hindsight bias might cloud any proffered race-neutral reasons for the strikes. See <u>Miller-El v. Dretke</u>, 125 S. Ct. at 2326 n.1 (noting that evidence presented at a <u>Batson</u> hearing conducted two years after trial "was subject to the usual risks of imprecision and distortion from the passage of

time") (internal quotation marks and citation omitted); id. at 2328 (refusing to credit a race-neutral explanation offered by the prosecution that "reek[ed] of afterthought").[18]

I am also unconvinced by the government's argument that it could not have violated Batson because it did not know the self-reported ethnicity of the prospective jurors at the time it exercised its peremptory strikes.[19] Litigants do not need to know the self-reported race or ethnicity of a juror to violate Batson. Rather, the Supreme Court recognizes that litigants can and will discriminate during the jury selection process based on venire members' appearances, demeanor, and voices, and not simply on the basis of their self-reported race. See Batson, 476 U.S. at 129-30 & nn.10-11

---

[18] Judicial speculation into the prosecution's reasons for striking a juror is prohibited at any stage in the Batson analysis. See Johnson, 125 S. Ct. at 2418-19; Miller-El v. Dretke, 125 S. Ct. at 2331-32 ("[T]he rule in Batson provides an opportunity to the prosecutor to give the reason for striking the juror, and it requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it. It is true that peremptories are often the subjects of instinct, and it can sometimes be hard to say what the reason is. But when illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives. A Batson challenge does not call for a mere exercise in thinking up any rational basis. If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false.") (internal citations omitted).

[19] The majority suggests that this position involves fact-finding. Majority Op. at 50 ("Neither is the dissent in a position to fact-find to the contrary here . . . ."). But observing that the district court refused to make a finding when the defendant pointed out that the struck jurors looked Hispanic and spoke with a Hispanic accent is not fact-finding. It is pointing out that the district court avoided finding facts on this issue. The majority contests this interpretation, but by construing a series of questions by the district court to both Ochoa's counsel and the United States as a "basis" for denying Ochoa's Batson challenge, it is the majority that is engaging in unwarranted inferences.

82

(Burger, C.J., dissenting) (noting that "[the Batson] Court states as fact that 'a jury composed only of white persons was selected'" solely on the basis of the prosecutor's statement that "[in] looking at them, yes; it's an all-white jury" and noting the possibility that the "proper inquiry [under Batson] concerns not the actual race of the jurors who are excluded, but rather counsel's subjective impressions as to what race they spring from"); id. at 96 ("[T]he defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate.") (internal quotation marks omitted); Miller-El v. Dretke, 125 S. Ct. at 2341 (Breyer, J., concurring) (noting that racial bias in the jury selection process can be automatic, unconscious, and unintentional); Edmonson v. Leesville Concrete Co., Inc., 500 U.S. 614, 628 (1991) ("To permit racial exclusion in [the jury selection process] … compounds the racial insult inherent in judging a citizen by the color of his or her skin."); Hernandez v. New York, 500 U.S. 352, 371-72 (1991) (plurality opinion) ("[A] policy of striking all who speak a given language, without regard to the particular circumstances of the trial or the individual responses of the jurors, may be found by the trial judge to be a pretext for racial discrimination."); see also People v. Motton, 704 P.2d 176, 180 (Cal. 1985) (addressing improper racial discrimination through the use of peremptory strikes under People v. Wheeler, 583 P.2d 748 (Cal.

1978), and stating that "it is unnecessary to establish the true racial identity of the challenged jurors; discrimination is more often based on appearances than verified racial descent, and a showing that the prosecution was systematically excusing persons who appear to be Black would establish a prima facie case under Wheeler").[20]

For the foregoing reasons, I believe that Ochoa is entitled to a new trial by an impartial jury selected in accordance with the Equal Protection and Due Process Clauses of our Constitution.

---

[20] Cf. Stephens v. State, 884 So. 2d 1071 (Fla. Dist. Ct. App. 2004) (holding that when a criminal defendant had made out a prima facie case of discrimination regarding the prosecution's strike of an ostensibly African-American juror under Melbourne v. State, 679 So. 2d 759 (Fla. 1996), the fact that the prosecutor "did not know the prospective juror's race" did not constitute, by itself, a race-neutral explanation for the strike under Florida law).